Gerardo Dennis PATRICKSON; Rodolfo Bermudez Arias; Benigno Torres Hernandez; Fernando Jimenez Arias; Santos Leandros; Herman Romero Aguilar; Elias Espinoza Merelo Hooker Era Celestino; Alirio Manuel Mendez; Carlos Humberto Rivera, individually and on behalf of others similarly situated, Plaintiffs–Appellants,

v.

DOLE FOOD COMPANY, INC.; Dole Fresh Fruit Company; Dole Fresh Fruit International, Limited; Pineapple Growers Association of Hawaii;

Amvac Chemical Corporation; Shell Oil Company; Dow Chemical Company; Occidental Chemical Corporation, individually and as successor to Occidental Chemical Company and Occidental Chemical Agricultural Products, Inc., Hooker Chemical and Plastics, Occidental Chemical Company of Texas and Best Fertilizer Company; Standard Fruit Co.; Standard Fruit & Steamship Co.; Standard Fruit Company De Costa Rica, S.A.; Standard Fruit Company De Honduras, S.A.; Chiquita Brands, Inc.; Chiquita Brands International, Inc., Individually; United Brands Company, Inc., suc Chiquita Brands International, Inc.; Maritrop Trading Corporation; Del Monte Fresh Produce, N.A.; Del Monte Fresh Produce Hawaii, Inc.; Del Monte Fresh Produce Company and Fresh Del Monte N.V., Defendants–Appellees,

v.

Dead Sea Bromine Co., Ltd.; Bromine Compounds Limited, Third–party–defendants–Appellees.

Gerardo Dennis Patrickson; Rodolfo Bermudez Arias; Benigno Torres Hernandez; Fernando Jimenez Arias; Santos Leandros; Herman Romero Aguilar; Elias Espinoza Merelo Hooker Era Celestino; Alirio Manuel Mendez; Carlos Humberto Rivera, individually and on behalf of others similarly situated, Plaintiffs–Appellees,

v.

Dole Food Company, Inc.; Dole Fresh Fruit Company; Dole Fresh Fruit International, Limited; Pineapple Growers Association of Hawaii; AM-

VAC Chemical Corporation; Shell Oil Company; Dow Chemical Company; Occidental Chemical Corporation, individually and as successor to Occidental Chemical Company and Occidental Chemical Agricultural Products, Inc., Hooker Chemical and Plastics, Occidental Chemical Company of Texas and Best Fertilizer Company; Standard Fruit Co.; Standard Fruit & Steamship Co.; Standard Fruit Company De Costa Rica, S.A.; Standard Fruit Company De Honduras, S.A.; Chiquita Brands, Inc.; Chiquita Brands International, Inc., individually; United Brands Company, Inc., suc Chiquita Brands International, Inc.; Maritrop Trading Corporation; Del Monte Fresh Produce, N.A.; Del Monte Fresh Produce Hawaii, Inc.; Del Monte Fresh Produce Company and Fresh Del Monte N.V., Defendants–Appellees,

and

Dead Sea Bromine Co., Ltd.; Bromine Compounds Limited, Third–party–defendants–Appellants.

Nos. 99–16524, 99–16770.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 9, 2000

Filed May 30, 2001

Jonathan S. Massey, Washington, DC, argued the cause for the plaintiffs-appellants.

Robert H. Klonoff, Jones, Day, Reavis & Pogue, Washington, DC, and Boaz S. Morag, Cleary, Gottlieb, Steen & Hamilton, New York, NY, argued the cause for the defendants-appellees.

Peter R. Paden, Robinson Silverman Pearce Aronsohn & Berman LLP, New York, NY, argued the cause for the third-party-defendants-appellees.

Before: KOZINSKI, GRABER and FISHER, Circuit Judges.

KOZINSKI, Circuit Judge:

We consider whether the federal courts have jurisdiction over a class action brought by Latin American banana workers against multinational fruit and chemical companies alleged to have exposed the workers to a toxic pesticide.

## I

Dibromochloropropane (DBCP) is a powerful pesticide. Tough on pests, it's no friend to humans either. Absorbed by the skin or inhaled, it's alleged to cause sterility, testicular atrophy, miscarriages, liver damage, cancer and other ailments that you wouldn't wish on anyone. Originally manufactured by Dow Chemical and Shell Oil, the pesticide was banned from general use in the United States by the Environmental Protection Agency in 1979. But the chemical companies continued to distribute it to fruit companies in developing nations.

In our case, banana workers from Costa Rica, Ecuador, Guatemala and Panama brought a class action against Dole Food Company, other major fruit companies and chemical companies (hereinafter "Dole") for injuries allegedly sustained from exposure to DBCP in their home countries. This case represents one front in a broad litigation war between these plaintiffs' lawyers and these defendants. In some of the cases, plaintiffs have reportedly won multi-million dollar settlements. *See* Larry K. Lowry & Arthur L. Frank, *Exporting DBCP and Other Banned Pesticides: Consideration of Ethical Issues,* 5 Int'l J. Occup. Envtl. Health 135, 140 (1999). In others, defendants have managed to have the cases dismissed for forum non conveniens. *See, e.g., Delgado v. Shell Oil Co.,* 231 F.3d 165, 169 (5th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1603, 149 L.Ed.2d 470 (2001); *Sibaja v. Dow Chem. Co.,* 757 F.2d 1215, 1216 (11th Cir.1985).

The merits are not before us. Instead, we must decide whether the case is properly in federal court. The workers brought suit in Hawaii state court. Dole responded by impleading two Israeli chemical companies, Dead Sea Bromine Company and Bromine Compounds Limited ("Dead Sea Companies"), which are alleged to have manufactured some of the DBCP used in plaintiffs' home countries. The Companies were, until recently, indirectly owned by the Israeli government, and they immediately removed the case to federal court pursuant to the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1330. Dole likewise removed based on federal-question jurisdiction, 28 U.S.C. § 1331. The district court denied plaintiffs' remand motion and then dismissed the case for forum non conveniens.

## II

Dole was entitled to remove the case to federal court if plaintiffs could have brought it there to begin with. *See* 28 U.S.C. § 1441(a). We must therefore consider whether plaintiffs could have brought the case in district court under federal-question jurisdiction or the FSIA[1]

---

1. Because Dole Food Company is a citizen of the forum state, defendants could not remove

## A. Federal–Question Jurisdiction

We are courts of limited jurisdiction. This means we hear only those cases that Congress directs and the Constitution permits us to hear. Under Article III, federal courts may assert jurisdiction over federal questions, extending to all cases "arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2. Although any federal ingredient may be sufficient to satisfy Article III, the statutory grant of jurisdiction under 28 U.S.C. § 1331 requires more. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 495, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ("Article III 'arising under' jurisdiction is broader than federal-question jurisdiction under § 1331 ....").

■ Even if the case turns entirely on the validity of a federal defense, federal courts may not assert jurisdiction unless a federal right or immunity is "an element, and an essential one, of the plaintiff's cause of action." *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 11, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (quoting *Gully v. First Nat'l Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936)). This venerable "well-pleaded complaint" rule keeps us from becoming entangled in state law controversies on the conjecture that federal law may come into play at some point during the litigation; it also ensures that Congress retains control over the size of federal court dockets.

Under conventional principles, the class action here unquestionably arises under state law. Plaintiffs seek relief under the common law of Hawaii for negligence, conspiracy, strict liability, intentional torts and breach of implied warranty. None of

based on diversity of citizenship. *See* 28

the claims has an element premised on a right created by Congress or the Constitution. Dole nonetheless argues that we have federal-question jurisdiction because the case calls for an application of the federal common law of foreign relations.

Although there is no general federal common law, "there are enclaves of federal judge-made law which bind the States." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 426, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). In *Sabbatino,* the Court held that one of those enclaves concerns the legal principles governing the nation's relationship with other members of the international community. The case considered whether the "act of state doctrine" requires U.S. courts to recognize the validity of the Cuban government's expropriation of private property. A long-standing common law principle, the act of state doctrine precludes courts from questioning the legality of actions that a foreign government has taken within its own borders. *See Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). *Sabbatino* considered whether the doctrine was a matter of state or federal law.

■ Because the Constitution gives the federal government exclusive authority to manage the nation's foreign affairs, the Court concluded that "rules of international law should not be left to divergent and perhaps parochial state interpretations." *Sabbatino,* 376 U.S. at 425, 84 S.Ct. 923. Whether a foreign state's act is given legal force in the courts of the United States is a "uniquely federal" question directly implicating our nation's foreign affairs. *See id.* at 425–26, 84 S.Ct. 923. Therefore, it was appropriate to fashion a single federal standard to govern such cases, rather than rely on a patchwork of separate state standards. Equally important, the Supreme

U.S.C. § 1441(b).

Court in *Sabbatino* reserved to itself ultimate review of all cases raising the act of state doctrine, rather than leaving them to the various state supreme courts. *See Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 51 (2d Cir.1965) (Friendly, J.) (*Sabbatino* held that "all questions relating to an act of state are questions of federal law, to be determined ultimately, if need be, by the Supreme Court of the United States.").

■ Federal-question jurisdiction was not an issue in *Sabbatino;* the district court already had jurisdiction because of diversity of citizenship. The question presented was what substantive law would apply-state law pursuant to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), or federal law. *Sabbatino* held that the common law of foreign relations falls outside *Erie*'s general rule and so federal law applies. *See Sabbatino*, 376 U.S. at 425, 84 S.Ct. 923. Federal common law is, of course, federal law; so if a plaintiff's claim arises under the federal common law recognized by *Sabbatino*, the federal courts will have jurisdiction under 28 U.S.C. § 1331.[2] *See Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (" § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.").

This is as far as *Sabbatino* goes, and it's not far enough, because nothing in plaintiffs' complaint turns on the validity or invalidity of any act of a foreign state. Plaintiffs seek compensation for injuries sustained from the defendants' manufacture, sale and use of DBCP. Plaintiffs don't claim that any foreign government participated in such activities or that the defendants acted under the color of foreign law. The case-at least as framed by plaintiffs-does not require us to evaluate any act of state or apply any principle of international law. The common law of foreign relations will become an issue only when-and if-it is raised as a defense.

Dole nonetheless argues that we must assert federal-question jurisdiction because the case concerns a vital sector of the economies of foreign countries and so has implications for our nation's relations with those countries. Plaintiffs represent a class of perhaps thousands of foreign nationals who allege that large multinational corporations harmed them in their home countries.[3] Dole argues that, by granting relief, American courts would damage the banana industry-one of the most important sectors of those countries' economies-and cast doubt on the balance those governments have struck between agricultural development and labor safety. Although plaintiffs allege only state law

2. Although the act of state doctrine generally serves as a defense, it can also be used affirmatively as the basis of a claim. *See* Restatement (Third) of Foreign Relations Law § 443 cmt. i (1986) (noting that an act of state may be "necessary to a litigant's claim or defense"); *see also Republic of Philippines v. Marcos*, 806 F.2d 344, 354 (2d Cir.1986) ("We hold that federal jurisdiction is present in any event because the claim raises, as a necessary element, the question whether to honor the request of a foreign government that the American courts enforce the foreign government's directives to freeze property in the United States subject to future process in the

foreign state."); *Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845, 854 (2d Cir.1962) (plaintiff must establish title as an element of his conversion claim, and title rests on the Cuban expropriation decree), *rev'd on other grounds, Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804.

3. As the district court recognized, such claims may raise serious questions of forum non conveniens under federal and state law. Of course, the federal courts may decide that issue only if we have jurisdiction over the case.

claims, Dole argues, this case implicates the "uniquely federal" interest in foreign relations, and so must be heard in a federal forum. In essence, Dole interprets *Sabbatino* as creating an exception not only to *Erie*, but to the well-pleaded complaint rule as well.

Dole's position is not without support. In *Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 543 (5th Cir.1997), the Fifth Circuit asserted federal-question jurisdiction over a state tort action brought by hundreds of Peruvian citizens against an American company because of injuries they had allegedly suffered from exposure to toxic gases during copper smelting and refining operations in Peru. The court concluded that, although the Peruvian government was not a party, it had "participated substantially" in the mining project through ownership of the land and minerals on which the mining operation was located. *See id.* The court also noted that the mining industry made up a significant part of Peru's gross national product, and the Peruvian government had vigorously protested to our State Department that the case threatened Peru's sovereign interests. As a consequence, the Fifth Circuit held that the "plaintiffs' complaint raises substantial questions of federal common law by implicating important foreign policy concerns." *Id.* While reaching the opposite result on the facts before it, the Eleventh Circuit seems to have adopted the

Fifth Circuit's theory in *Torres*. *See Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1377 (11th Cir.1998) (noting that, "[w]here a state law action has as a substantial element an issue involving foreign relations or foreign policy matters, federal jurisdiction is present" but concluding that a suit brought by Venezuelan citizens injured in a pipeline explosion did not affect American foreign policy).

*Torres* and *Pacheco de Perez* relied principally on *Republic of Philippines v. Marcos*, 806 F.2d 344, 353 (2d Cir.1986), which seems to have been the first case to conclude that "there is federal question jurisdiction over actions having important foreign policy implications." [4] In *Marcos*, the Republic of the Philippines sued its former dictator to enjoin him from disposing of property allegedly looted from the government and claimed as state property under an executive order of the Philippine government. *See id.* at 347. Because the Republic's claims rested on the Philippine executive order, *Marcos* could be read as an act of state case, and the Second Circuit may well have grounded federal jurisdiction entirely on that basis. *See id.* at 354 ("[F]ederal jurisdiction is present in any event because the claim raises, as a necessary element, the question whether ... the American courts [should] enforce the foreign government's directives to freeze property...." ).

---

**4.** *Torres* relied on only one other case, *Texas Indus. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), which was an antitrust case that had nothing to do with foreign relations. *Torres* cited *Texas Industries* apparently because it, in turn, cited *Sabbatino*. *See Texas Indus.*, 451 U.S. at 641, 101 S.Ct. 2061.

*Torres* also distinguished *Aquafaith Shipping, Ltd. v. Jarillas*, 963 F.2d 806, 808 (5th Cir.1992), which had held that the well-pleaded complaint rule applies with full force to cases arising under the federal common law

of foreign relations. In *Aquafaith*, the defendants alleged that a maritime suit arose under federal law because the Philippine government had involved itself with the plaintiff's claims. *Aquafaith* rejected the claim on the ground that the foreign government's involvement didn't appear anywhere in the plaintiff's complaint. *Id.* at 809. *Torres* concluded that the plaintiff's claims in *Aquafaith* had not "necessarily implicate[d] vital economic and sovereign interests" of a foreign power, as they did in *Torres*. 113 F.3d at 542 n. 8.

However, *Marcos* clearly *said* more, broadly suggesting that federal-question jurisdiction could "probably" be premised on the fact that a case may affect our nation's foreign relations, whether or not federal law is raised by the plaintiff's complaint: "[A]n action brought by a foreign government against its former head of state arises under federal common law because of the necessary implications of such an action for United States foreign relations." *Id.*[5] This reads far too much into *Sabbatino*. As noted, *Sabbatino* was about choice of law, not jurisdiction. The Court left no doubt that the substantive law of foreign relations must be federal, and it stressed the need for national uniformity. But *Sabbatino* does not say that federal courts alone are competent to develop this body of law. To the contrary, *Sabbatino* notes that the law of foreign relations is like other "enclaves of federal judge-made law which bind the States," such as the rules filling the interstices of federal statutes and the laws regulating interstate boundary issues. *Sabbatino*, 376 U.S. at 426, 84 S.Ct. 923. The Court's reference to binding the states makes sense only if one assumes that state courts will be called upon to apply the law of foreign relations. *Sabbatino* says as much: "[T]he act of state doctrine is a principle of decision binding on federal and state courts alike...." *Id.* at 427, 84 S.Ct. 923; *see also* Henry Friendly, *In Praise of Erie-and of the New Federal Common Law*, 39 N.Y.U. L.Rev. 383, 405 (1964) ("*Erie* led to the emergence of a federal decisional law in areas of national concern that is truly uniform because, under the supremacy clause, it is binding in every forum....").

State courts apply federal law in a wide variety of cases and, by doing so, they necessarily develop it. This does not undermine the nationwide uniformity of federal law much more than having somewhat different applications of federal law in the various federal circuits. Ultimately, the Supreme Court has the final say on any question of federal law, whether it arises in federal or state court, and this is thought sufficient to ensure nationwide uniformity in areas as diverse as criminal procedure, patent law and labor law.[6]

---

**5.** In reaching this conclusion, the Second Circuit relied on several authorities, none particularly helpful, among them Judge Friendly's opinion in *Republic of Iraq*, 353 F.2d at 50. To be sure, Judge Friendly stressed the need for national uniformity in cases concerning foreign acts of state, but *Republic of Iraq*, like *Sabbatino*, was a diversity case and thus has nothing to say about federal-question jurisdiction.

*Marcos* also seemed to draw support from *Franchise Tax Board*, 463 U.S. at 23, 103 S.Ct. 2841, where the Supreme Court noted that federal-question jurisdiction may exist "even though the plaintiff pleads a state cause of action if federal law 'is so powerful as to displace entirely any state cause of action.'" *Marcos*, 806 F.2d at 354 (quoting *Franchise Tax Bd.*, 463 U.S. at 23, 103 S.Ct. 2841). We find this reference to *Franchise Tax Board* curious. While the Supreme Court acknowledged that a state action may arise under federal law when Congress has established a federal cause of action preempting state law, *see Franchise Tax Bd.*, 463 U.S. at 23–24 (citing *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 560, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)), we fail to see what analogous federal action *Marcos* had in mind when it suggested that a state dispute over real property might have been preempted by federal law.

**6.** *See, e.g., Boy Scouts of Am. v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (reviewing state interpretation of First Amendment); *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (reviewing state interpretation of substantive due process); *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (reviewing state interpretation of the Fourth Amendment); *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (reviewing state interpretation of dormant Commerce Clause); *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222

We see no reason to treat the federal common law of foreign relations any differently than other areas of federal law. Certainly, federal courts have preeminence in developing all areas of federal law by virtue of the fact that almost all cases premised on federal law may be brought in or removed to federal court. In addition, Congress has provided federal jurisdiction in certain cases implicating our foreign relations, regardless of the nature of the claim. *See, e.g.,* 28 U.S.C. § 1251(b)(1) (suits where ambassadors or other foreign government officials are parties); *id.* § 1351 (suits against foreign consuls or other diplomatic personnel); *id.* § 1330 (suits against a foreign state); *see also id.* § 1350 (suits brought by an alien for a tort committed in violation of international law). What Congress has not done is to extend federal-question jurisdiction to all suits where the federal common law of foreign relations might arise as an issue. We interpret congressional silence outside these specific grants of jurisdiction as an endorsement of the well-pleaded complaint rule.

We therefore decline to follow *Marcos, Torres* and *Pacheco de Perez* insofar as they stand for the proposition that the federal courts may assert jurisdiction over a case simply because a foreign government has expressed a special interest in its outcome. *Accord In re Tobacco/Governmental Health Care Costs Litig.,* 100

F.Supp.2d 31, 36–38 (D.D.C.2000). It may well be that our foreign relations will be implicated by the pendency of a lawsuit on a subject that affects that government's sovereign interests; the courts in *Marcos* and *Torres* certainly believed this to be the case. But we see no logical connection between such an effect and the assertion of federal-question jurisdiction. That the case is litigated in federal court, rather than state court, will not reduce the impact of the case on the foreign government. Federal judges cannot dismiss a case because a foreign government finds it irksome, nor can they tailor their rulings to accommodate a non-party. Federal judges, like state judges, are bound to decide cases before them according to the rule of law. If a foreign government finds the litigation offensive, it may lodge a protest with our government; our political branches can then respond in whatever way they deem appropriate-up to and including passing legislation. Our government may, of course, communicate its own views as to the conduct of the litigation, and the court-whether state or federal-can take those views into account.[7] But it is quite a different matter to suggest that courts-state or federal-will tailor their rulings to accommodate the expressed interests of a foreign nation that is not even a party.

Nor do we understand how a court can go about evaluating the foreign policy im-

(1985) (reviewing state interpretation of the Fifth Amendment); *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (reviewing state decision under the patent laws); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962) (reviewing state interpretation of federal labor laws).

7. As Judge Paul Friedman noted in *In re Tobacco Litigation:*
 [T]o the extent that the United States government is concerned about potential ad-

verse foreign relations consequences from the resolution of these lawsuits, the Executive Branch possesses the competence, capacity and incentive to make its view known either to this Court or the state courts in which the suits were brought. The Executive Branch is responsible for the conduct of foreign affairs and may address any potential foreign relations issues that may arise in these cases.
 100 F.Supp.2d at 38.

plications of another government's expression of interest. Assuming that foreign relations are an appropriate consideration at all, the relevant question is not whether the foreign government is pleased or displeased by the litigation, but how the case affects the interests of the United States. That is an inherently political judgment, one that courts-whether state or federal-are not competent to make. *See Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) ("This Court has little competence in determining precisely when foreign nations will be offended by particular acts...."); *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial."); *In re Tobacco Litig.*, 100 F.Supp.2d at 38 ("[T]he federal courts have little context or expertise by which to analyze and address the potential implications of a lawsuit on foreign relations."). If courts were to take the interests of the foreign government into account, they would be conducting foreign policy by deciding whether it serves our national interests to continue with the litigation, dismiss it on some ground such as forum non conveniens, or deal with it in some other way.[8] *See* Jack L. Goldsmith, *Federal Courts, Foreign Affairs, and Federalism*, 83 Va. L.Rev. 1617, 1667 (1997). Because such political judgments are not within the competence of either state or federal courts, we can see no support for the proposition that federal courts are better equipped than state courts to deal with cases raising such concerns.[9]

As Justice Frankfurter noted in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 379, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), federal courts must be hesitant "to expand the jurisdiction of the federal courts through a broad reading of jurisdictional statutes." If federal courts are so much better suited than state courts for handling cases that might raise foreign policy concerns, Congress will surely pass a statute giving us that jurisdiction. Because we see no evidence that Congress meant for the federal courts to assert jurisdiction over cases simply because foreign

---

**8.** We note, for example, that the Fifth Circuit in *Torres* had before it an amicus brief from the government of Peru, but none from our own government. Based on Peru's representations, the court concluded that Peru had a vital interest in the case and the litigation might adversely affect Peru's relations with the United States. *See Torres,* 113 F.3d at 542–43. Apparently, the Fifth Circuit believed that it served the interests of the United States to avoid this consequence, so it asserted jurisdiction and affirmed the dismissal on grounds of forum non conveniens. *See id.* at 543–44. But it is just as plausible that our government did not express its views because it was indifferent to Peru's discomfort or even reveled in it. Courts should not put themselves in the position of having to make such judgments.

**9.** We are particularly troubled by the suggestion in *Pacheco de Perez* (echoed by Dole in our case) that federal jurisdiction will hinge on whether a foreign government has taken a position in support or in opposition to the litigation. *See* 139 F.3d at 1378. The Eleventh Circuit noted that the Peruvian government in *Torres* had opposed the litigation, both in a communication to our State Department and an amicus brief filed in the Fifth Circuit. The Eleventh Circuit found it significant that, by contrast, "the Venezuelan government has taken no position on whether [the *Pacheco de Perez*] lawsuit proceeds in the United States or in Venezuela." *Id.* Inviting foreign governments to tell us how litigation in our courts affects their interests can only put us in the awkward position of causing an affront to those governments if their interests are not respected. We consider it far more prudent to state clearly that the effect of the litigation on the economies of foreign countries is of absolutely no consequence to our jurisdiction.

governments have an interest in them, we must part company with our sister circuits. *Accord In re Tobacco Litig.*, 100 F.Supp.2d at 36.

### B. *Foreign Sovereign Immunities Act*

As an alternative source of jurisdiction, the Dead Sea Companies argue that they are instrumentalities of a foreign state under the FSIA. *See* 28 U.S.C. §§ 1330, 1603. The FSIA grants the federal courts jurisdiction over an action brought against "an agency or instrumentality of a foreign state," *id.* § 1603(a), which is defined to include any entity that is "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id.* § 1603(b)(2).

Until the 1990s, the government of Israel indirectly owned a majority of shares in both companies by owning all the shares of their parent, Israel Chemicals Limited. An Israeli statute, the Government Companies Law, granted the Israeli government a veto over certain decisions of the Dead Sea Companies, including the appointment of the directors and officers, changes in their capital structures, and the use of corporate profits. The Companies also emphasize that the government of Israel exerted control over them through the state's ownership of the Dead Sea's mineral resources on which the Companies relied for their enterprise.

1. The Israeli government privatized most of its holdings in Israel Chemicals Limited during the 1990s and so, by the time this suit was filed in 1997, the government no longer owned, indirectly or otherwise, a majority of the shares in the Dead Sea Companies. Because the FSIA grants jurisdiction to the federal courts where an

entity "*is* an organ of a foreign state or political subdivision thereof," *id.* § 1603(b)(2) (emphasis added), we must first consider what the meaning of "is," is.[10] Does the FSIA apply to companies that were owned by the state at the time of the allegedly tortious conduct, but have since been cut free?

In *Straub v. A P Green, Inc.*, 38 F.3d 448, 451 (9th Cir.1994), we held that the FSIA applies when a party is a state instrumentality at the time the lawsuit is filed, even though it was not an instrumentality at the time of the alleged wrongdoing. *Straub* did not decide whether the FSIA would also apply in the converse case involving entities that were no longer instrumentalities, but had been at the time of the alleged wrongdoing. *See id.* However, all courts that have considered the issue have held that the FSIA applies to an entity that was a foreign state at the time of the wrongdoing, even if the entity is no longer a state instrumentality. *See, e.g., Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 480–81 (5th Cir.1998); *General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1381–82 (8th Cir.1993); *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir.1988).

We do not find this question as easy as the unanimity of other circuits would suggest. By its terms, the FSIA applies only to an entity that "is" a foreign state at the time of the suit. 28 U.S.C. § 1603(b)(2). The statute does not say that it applies to an entity that used to be a state, although Congress could easily have said so. Moreover, the statute contains special rules for service of process on the foreign state, *see id.* § 1608, and for enforcing a judgment against the foreign state. *See id.* §§ 1609–10. We have no doubt that, in enacting

---

10. We are not the first federal employees to tackle this question. *See* Robert Blecker, *How Does Congress Define "Perjury"?*, Wall St. J., Dec. 9, 1998, at A22.

the FSIA, Congress had in mind suits brought against entities that are currently foreign states.

It is unclear that the policies of the FSIA would be served by extending that immunity to entities that are now private but were state actors at the time of the alleged wrong. The FSIA seeks to avoid affronting other governments by making it hard for private litigants to haul them into court. *See First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 762, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality op.). Wrongs committed by foreign nations are presumed to raise questions of foreign policy rather than law, and an aggrieved party ordinarily must seek redress through diplomatic channels, rather than through a civil complaint. *See id.* (quoting *The Schooner Exch. v. M'Faddon,* 11 U.S. (7 Cranch) 116, 146, 3 L.Ed. 287 (1812)). But when the entity is no longer part of the foreign state, it is not clear that the civil suit will force the state to appear and defend itself in an American tribunal.[11] Nor will American courts necessarily have to worry about ordering a foreign state to pay money to a private litigant. At the same time, diplomatic channels may be of no avail in resolving a dispute between private parties.

Of course, a case against an entity formerly owned by the state may raise other kinds of concerns. Where the defendant was a foreign state at the time of the alleged wrong, the complaint perforce alleges that the foreign state did something wrong. By adjudicating that claim, the court may have to pass judgment on the acts or decisions of a foreign sovereign. But the merits of such acts may well be insulated from judicial scrutiny by the act of state doctrine and, in any event, the affront to the foreign sovereign will be remote and indirect if it is not held answerable for the harm it may have caused. If concern over adjudicating whether the foreign sovereign acted wrongfully were the key to FSIA immunity, *Straub* should have come out the other way because the entity that committed the wrong there was not a government entity at the time of the alleged wrongdoing. There is thus a plausible basis for concluding that the FSIA does not come into play where a suit is brought against a private entity that was a foreign state at the time of the alleged wrongdoing, but is no longer.

However, the question is a close one, and the answer is ultimately not dispositive here. We will therefore assume for the purposes of this case that the FSIA would grant federal jurisdiction over an entity that at the time of the tortious conduct was-but no longer is-a government instrumentality.

 **2.** Proceeding on that assumption, we turn to whether the Dead Sea Companies were in fact instrumentalities of the Israeli government. In *Gates v. Victor Fine Foods,* 54 F.3d 1457, 1462 (9th Cir.1995), we held that under the FSIA, a corporation owned by an instrumentality of a foreign government is not itself an instrumentality of that government. An instrumentality includes any entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). *Gates* read that provision as limiting an instrumentality to the first tier

---

**11.** We recognize that state officials formerly involved with the then-state entity might be drawn into the litigation, for instance as key witnesses, a circumstance that might affect the immunity analysis. *Cf. Clinton v. Jones,* 520 U.S. 681, 720, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (Breyer, J., concurring) (noting that "the Court, in numerous other cases, has found the problem of time and energy distraction a critically important consideration militating in favor of a grant of immunity.").

of ownership: those entities owned directly by the foreign state itself or by a political subdivision. It held that a corporation wholly owned by an instrumentality of a foreign government is not a foreign instrumentality under the FSIA.

Because the Dead Sea Companies were never owned directly by the Israeli government, *Gates* would seem to foreclose their claim to be instrumentalities through stock ownership. Because they must, the Companies do their best to distinguish *Gates*. First, they argue that *Gates* did not consider whether the indirect ownership of stock qualified as an "other ownership interest" under section 1603(b)(2). An instrumentality under the FSIA includes entities in which the foreign government owns a majority of the shares or some "other ownership interest." We decline to read "other ownership interest" in such a way as to make the majority-shareholder requirement superfluous. Instead, we read it simply to describe some other form of ownership not called shares of stock. That provision does not include the indirect ownership of shares specifically foreclosed by *Gates*.

Second, the Dead Sea Companies suggest that *Gates* held only that the subsidiary of an *organ* of a foreign state is not an instrumentality, while a subsidiary of a state-owned corporation may be one. We see no rationale supporting such a distinction. If anything, we would more readily view an organ of a foreign state as an extension of the government than we would so view a state-owned business. Moreover, we already have read *Gates* for the broader holding that "an entity wholly owned by 'an agency or instrumentality of a foreign state' is not owned by a 'foreign state or a political subdivision thereof.'" *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir.1996) (describing the

holding in *Gates* ). Because an instrumentality under the FSIA includes both organs and government-owned corporations, *Gates*'s holding covers the Israeli government's interest in the Dead Sea Companies.

The Companies point out that several other circuits have disagreed with *Gates* and held that subsidiaries of a corporation owned by a foreign state are in fact instrumentalities under the FSIA. *See, e.g., Delgado v. Shell Oil Co.*, 231 F.3d 165, 176 (5th Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1603, —— L.Ed.2d —— (2001); *In re Air Crash Disaster Near Roselawn, Ind.*, 96 F.3d 932, 941 (7th Cir.1996); *Gould*, 853 F.2d at 448–50. They argue, not implausibly, that federal courts should not care how a foreign government structures its ownership interests so long as it, in fact, owns a majority interest in a particular corporation. But none of this matters, because *Gates* decided this question, and we are bound by its authority.

3. In the alternative, the Dead Sea Companies argue that they were "organs" of the Israeli government under section 1603(b)(2). In defining whether an entity is an organ, courts consider whether the entity engages in a public activity on behalf of the foreign government. In making this determination, courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law. *See Corporacion Mexicana*, 89 F.3d at 654–55; *Gates*, 54 F.3d at 1461. The entity may be an organ even if it has some autonomy from the foreign government. *See id.* ("[T]hat the [state] is not directly involved in the day-to-day activities of [the entity] does not mean that it is not exercising control over the entity....").

Courts have recognized as organs such quasi-public entities as national banks, state universities and public television networks. In *Gates,* we held that an industry board that regulated the Canadian pork market was an organ where it exercised regulatory authority delegated by the government; its decisions could be appealed to a government agency; and its members enjoyed immunity from suit for their official duties. *See id.* Closer to our case, we have held that a Mexican oil refinery was an organ where it was entirely owned by the government; controlled by government appointees; employed only public servants; and had the exclusive responsibility for refining and distributing Mexican government property. *See Corporacion Mexicana,* 89 F.3d at 654–55; *see also Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 848 (5th Cir.) (a Syrian petroleum company was a government organ where Syria had created the company and granted it exclusive rights to exploit the country's petroleum reserves for the benefit of the state, rather than in pursuit of profits, and half the directors were high-level government officials), *cert denied,* —— U.S. ——, 121 S.Ct. 426, 148 L.Ed.2d 435 (2000).

The Dead Sea Companies argue that, like the oil company in *Corporacion Mexicana,* the Companies were government organs created by Israel for the purpose of exploiting the Dead Sea resources owned by the government. The Dead Sea Companies were classified as "government companies" under Israeli law, which gave the government certain privileges reflecting its ownership stake. The government had the right to approve the appointment of directors and officers, as well as any changes in the capital structure of the Companies, and the Companies were obliged to present an annual budget and financial statement to various government ministries. The government could constrain the use of the Companies' profits as well as the salaries of the directors and officers.

Although Israeli law granted such authority directly to the Israeli government, it is not considerably different from the control a majority shareholder would enjoy under American corporate law. In contrast to the oil refinery in *Corporacion Mexicana,* the Dead Sea Companies were not run by government appointees; their employees were not treated as civil servants; nor were the Companies wholly owned by the government of Israel. The Companies could sue and be sued, and could in fact sue the government of Israel (although official Israeli documents describe such disputes as between "a government company and another government body"). Nor did the Companies exercise any regulatory authority, as did the entity in *Gates.* These factors support the district court's view of the Companies as independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives.[12] Although the question is close, we hold that the Dead Sea Companies were not organs of the Israeli government, but indirectly owned commercial operations, which do not qualify as instrumentalities under the FSIA.

### III

The federal courts do not have jurisdiction over this case under either 28 U.S.C. § 1331 or 28 U.S.C. § 1330. Accordingly, we **REVERSE** the judgment of the district court and **REMAND** with instruc-

---

**12.** These factors also distinguish the Dead Sea Companies from the Syrian oil company in *Kelly,* 213 F.3d at 847–48, which was a non-profit-making entity, half of whose directors were high-level Syrian government officials.

tions that the district court remand the case to Hawaii state court.