257 F.3d 992 (9th Cir. 2001)
 EOTT ENERGY OPERATING LIMITED PARTNERSHIP, PLAINTIFF-APPELLEE,
v.
WINTERTHUR SWISS INSURANCE COMPANY; COMPAGNIE EUROPEENE D'ASSURANCES INDUSTRIELLES S.A.; ST. KATHERINE INSURANCE COMPANY, LIMITED; YASUDA FIRE AND MARINE INSURANCE COMPANY, (UK) LIMITED; LEXINGTON INSURANCE COMPANY; CNA REINSURANCE OF LONDON, LIMITED; IMPERIO CAMPANHIA DE SEGUROS; THE DOMINION INSURANCE COMPANY, LIMITED; FOLKSAM INTERNATIONAL INSURANCE COMPANY, (UK), LIMITED; EISEN UND STAHL RUCKVERSICHERUNGS AKTIENGESELLSCHAFT; LLOYDS SYNDICATES 989, 279AND 918; GRANITE STATE INSURANCE COMPANY, DEFENDANTS-APPELLANTS,
 and
WALBROOK INSURANCE COMPANY, EL PASO INSURANCE COMPANY, LIMITED; DART INSURANCE COMPANY, LIMITED; DART AND KRAFT INSURANCE COMPANY, LIMITED; BRYANSTON INSURANCE COMPANY, LIMITED; LOUISVILLE INSURANCE COMPANY, LIMITED; LUDGATE INSURANCE COMPANY, LIMITED; MUTUAL REINSURANCE COMPANY, LIMITED; BERMUDA FIRE AND MARINE INSURANCE COMPANY, LIMITED; INSURANCE CORPORATION OF IRELAND, LIMITED; ASSICURAZIONI GENERAL, S.P.A.; SCAN REINSURANCE COMPANY, LIMITED; PINE TOP INSURANCE COMPANY, LIMITED; ANCON INSURANCE COMPANY, (UK), LIMITED; BRITTANY INSURANCE COMPANY, LIMITED; INSCO, LTD.; ALLIANZ VERSICHERUNGS AKTIENGESELLSCHAFT; CHEMICAL INSURANCE COMPANY EMPLOYERS INSURANCE COMPANY OF WAUSAU; EVANSTON INSURANCE COMPANY; INSURANCE COMPANY OF FLORIDA; ZURICH INSURANCE COMPANY; INTERNATIONAL SURPLUS LINES INSURANCE COMPANY; GRANITE STATE INSURANCE COMPANY; SEDGWICK NORTH AMERICAN LIMITED; INTEGRITY INSURANCE COMPANY; IDEAL MUTUAL INSURANCE COMPANY; THE RIVER PLATE REINSURANCE COMPANY, LTD.; BRITACMO MENTOR INSURANCE COMPANY, (UK), LIMITED; PACIFIC AND GENERAL INSURANCE COMPANY, LIMITED; TRANSIT CASUALTY COMPANY; JOHN/JANE DOES I-X; ABC COMPANIES I-X; CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, DEFENDANTS.
EOTT ENERGY OPERATING LIMITED PARTNERSHIP, PLAINTIFF-APPELLANT,
v.
WINTERTHUR SWISS INSURANCE COMPANY; COMPAGNIE EUROPEENE D'ASSURANCES INDUSTRIELLES S.A.; ST. KATHERINE INSURANCE COMPANY, LIMITED; YASUDA FIRE AND MARINE INSURANCE COMPANY, (UK) LIMITED; LEXINGTON INSURANCE COMPANY; CNA REINSURANCE OF LONDON, LIMITED; IMPERIO CAMPANHIA DE SEGUROS; THE DOMINION INSURANCE COMPANY, LIMITED; FOLKSAM INTERNATIONAL INSURANCE COMPANY, (UK), LIMITED; EISEN UND STAHL RUCKVERSICHERUNGS AKTIENGESELLSCHAFT; LLOYDS SYNDICATES 989, 279AND 918, DEFENDANTS-APPELLEES,
and
WALBROOK INSURANCE COMPANY; EL PASO INSURANCE COMPANY, LIMITED; DART INSURANCE COMPANY, LIMITED; DART AND KRAFT INSURANCE COMPANY, LIMITED; BRYANSTON INSURANCE COMPANY, LIMITED; LOUISVILLE INSURANCE COMPANY, LIMITED; LUDGATE INSURANCE COMPANY, LIMITED; MUTAL REINSURANCE COMPANY, LIMITED; BERMUDA FIRE AND MARINE INSURANCE COMPANY, LIMITED; INSURANCE CORPORATION OF IRELAND, LIMITED; ASSICURAZIONI GENERAL, S.P.A.; SCAN REINSURANCE COMPANY, LIMITED; PINE TOP INSURANCE COMPANY, LIMITED; ANCON INSURANCE COMPANY, (UK), LIMITED; BRITTANY INSURANCE COMPANY, LIMITED; INSCO, LTD.; ALLIANZ VERSICHERUNGS AKTIENGESELLSCHAFT; CHEMICAL INSURANCE COMPANY; EMPLOYERS INSURANCE COMPANY OF WAUSAU; EVANSTON INSURANCE COMPANY; INSURANCE COMPANY OF FLORIDA; ZURICH INSURANCE COMPANY; INTERNATIONAL SURPLUS LINES INSURANCE COMPANY; GRANITE STATE INSURANCE COMPANY; SEDGWICK NORTH AMERICAN LIMITED; INTEGRITY INSURANCE COMPANY; IDEAL MUTUAL INSURANCE COMPANY; THE RIVER PLATE REINSURANCE COMPANY, LTD.; BRITACMO MENTOR INSURANCE COMPANY (UK), LIMITED; PACIFIC AND GENERAL INSURANCE COMPANY, LIMITED; TRANSIT CASUALTY COMPANY; JOHN/JANE DOES I-X; ABC COMPANIES I-X; CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, DEFENDANTS.
 No. 00-35293, No. 00-35315
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 13, 2001
Filed July 20, 2001
 
 Glenn E. Tremper, Church, Harris, Johnson & Williams, P.C., Great Falls, Montana, for the plaintiff-appellee-cross-appellant.
 John G. McAndrews, Joseph J. Winowiecki, Mendes & Mount, New York, New York; Jack L. Lewis, Patrick R. Watt and Brian L. Taylor, Jardine, Stephenson, Blewett & Weaver, P.C., Great Falls, Montana; and L.D. Nybo, Conklin, Nybo, LeVque & Lanning, Great Falls, Montana, for the defendants-appellants-cross-appellees.
 Appeal from the United States District Court for the District of Montana Richard F. Cebull, Magistrate Judge, Presiding D.C. No. CV-90-00122-RFC
 Before: Betty B. Fletcher, Melvin Brunetti and Raymond C. Fisher, Circuit Judges.
 Fisher, Circuit Judge:
 
 OVERVIEW
 
 1
 We are presented with the question of whether there is subject matter jurisdiction in this case. Eleven years ago, Appellee EOTT Energy, then known as Enron, filed this action in Montana state court. Appellant Icarom, then the Insurance Corporation of Ireland ("ICI"), removed this action to federal court on the ground that it was an instrumentality of a foreign state as defined by the Federal Sovereign Immunities Act ("FSIA"). Since that time, this case has been up on appeal before us and back to the district court where summary judgment was granted on some claims and a trial was held on others. This appeal then ensued.
 
 
 2
 During the pendency of this appeal, Appellants filed a letter with this Court stating that they had recently become aware of our decision in Gates v. Victor Fine Foods , 54 F.3d 1457 (9th Cir. 1995), and suggesting that, applying Gates, we might lack subject matter jurisdiction under the FSIA. We ordered supplemental briefing and heard argument on the issue. Both Appellants and Appellee argued there was jurisdiction. We conclude that Icarom is not a foreign state under the "majority owned" prong of the FSIA, but we remand for further fact-finding to determine whether Icarom is an "organ" of the Irish government.
 
 FACTUAL BACKGROUND
 
 3
 The parties and the underlying dispute are described in our previously published decision in Enron Oil Trading & Transportation Co. v. Walbrook Ins. Co., 132 F.3d 526 (9th Cir. 1997). We discuss here only the facts relevant to our determination of jurisdiction. These facts are taken primarily from three documents submitted in connection with the 1990 removal from state court: a declaration from Steve Guarnori, an Icarom employee; a 1985 press release from the Irish government; and a 1985 Act of the Irish Parliament.[1]
 
 
 4
 Prior to 1980, EOTT, at the time named UPG, Inc., purchased an insurance policy backed by ICI among others. In 1981, the Allied Irish Banks ("AIB") purchased a 25 percent share of ICI. In 1983, AIB purchased full control. Soon afterwards, AIB became aware that ICI was in poor financial condition and began injecting capital into ICI to bolster its reserves. In 1985, it became clear that ICI's problems were quite serious and a major reorganization and capital funding were necessary.
 
 
 5
 At the time, 30 percent of ICI's policies were written for insureds in Ireland and ICI was the country's second largest holder of employer's liability and public liability insurance policies (similar to workers' compensation), holding 25 percent of all such policies. ICI also held 30,000 motor insurance policies in Ireland. The Irish government became concerned that if ICI were unable to cover its policies, there would be ramifications across the Irish economy. Therefore, Ireland took several steps to guarantee ICI's solvency.
 
 
 6
 On March 15, 1985, Ireland acquired ICI from Allied Irish Banks for a nominal sum. At the same time, Ireland created Sealuchis Arachais Teoranta ("SAT") through legislation for the purpose of holding the shares of ICI. The enabling legislation provided that every member of SAT holds the shares of ICI in trust for the Minister for Industry, Trade, Commerce and Tourism ("Minister") and that all monies and dividends collected by SAT are to be paid to the Minister. Further, all of SAT directors are Ministry employees.
 
 
 7
 On the very evening ICI was acquired and SAT was formed, ICI was placed under court "administration" -a process similar to United States federal bankruptcy procedures. The purpose of the administration was to ensure the continuation of the insurance business of ICI and the protection of all policy holders (Irish and otherwise). Administration involves an indefinite period of court monitoring and protection until the company is placed on a sound commercial and financial footing. An Irish court appointed an administrator who exercises his powers subject to court sanction and may apply to the court for directions as to matters arising from the administration. The Minister is a notice party to all applications placed before the Irish court.
 
 
 8
 Five years later, on August 1, 1990, ICI sold all of its "Irish Business"-a term not defined in the documents -along with the name "Insurance Corporation of Ireland " to the Assurances Generales De France. At the same time, the Administrator changed the name of the existing ICI to "Icarom, plc." As part of the transaction, Icarom kept and administered all prior policies written by ICI, including the policy at issue here, on a run-off basis. It is unclear from the record whether Icarom wrote any new insurance policies after August 1, 1990.
 
 DISCUSSION
 
 9
 Although this case has been in federal court for over 11 years, we have an obligation to determine whether we and the court below have removal jurisdiction. See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.") (emphasis added); California v. United States, 215 F.3d 1005, 1009 (9th Cir. 2000) ("An appellate court is under a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it . . . . [or] make no contention concerning it.") (internal quotations omitted). If removal jurisdiction is lacking, even if raised for the first time on appeal, the judgment below must be vacated, and the case remanded to the state court. Id. at 1015.
 
 
 10
 Any civil action brought in the state courts against a foreign state as defined by the FSIA, 28 U.S.C.§§ 1603(a), may be removed to the district courts of the United States. See 28 U.S.C. §§ 1441(d). The FSIA provides:
 
 
 11
 (a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
 
 
 12
 (b) An "agency or instrumentality of a foreign state" means any entity -
 
 
 13
 (1) which is a separate legal person, corporate or otherwise, and
 
 
 14
 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 
 
 15
 (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.
 
 
 16
 28 U.S.C. § 1603. Icarom argued below that it is an "instrumentality of a foreign state" because the majority of its shares is owned by SAT, which in turn is controlled by the Minister for Ireland. On this appeal, Icarom also argues that it is an instrumentality under the "organ" prong of§§ 1603(b)(2). If either of these arguments holds true, the district court would have removal jurisdiction. Otherwise it would not.
 
 
 17
 EOTT, in its supplemental brief, also argued to the Court that an alternative basis for jurisdiction is diversity pursuant to 28 U.S.C. §§ 1332. It was brought to our attention by Appellants that plaintiff EOTT and defendant Lexington Insurance Corporation are both incorporated in Delaware. If that is indeed the case -the record is silent on Lexington's state of incorporation -there would be no diversity jurisdiction. On remand, the district court should determine whether there was complete diversity at the time removal was sought, or, if not, at the time it entered its final judgment. Harris v. Provident Life & Acc. Ins. Co., 26 F.3d 930, 932 (9th Cir. 1994) (holding that where a litigant objects to removal but fails to apply for an interlocutory appeal to preserve an attack on removal jurisdiction, the district court's judgment can be upheld if the court would have had original jurisdiction of the case at final judgment); see also O'Halloran v. University of Washington, 856 F.2d 1375, 1379 & n.2 (9th Cir. 1988).
 
 
 18
 A. The majority of Icarom's shares are not owned by a foreign state.
 
 
 19
 In its removal petition and on this appeal, Icarom argues it is an instrumentality of a foreign state because the majority of its shares are held by Ireland through the holding company SAT. In Gates and Patrickson v. Dole Food Company, Inc., 251 F.3d 795 (9th Cir. May 30, 2001), we held that a majority-owned subsidiary of an "instrumentality of a foreign state" is not itself an "instrumentality" under the FSIA. Id. at 807; Gates, 54 F.3d at 1462-63. This includes corporations that are subsidiaries of corporations that are owned by the foreign government. Patrickson, 251 F.3d 795, 807(holding majority-owned subsidiary of a government owned corporation is not an instrumentality of a foreign state). Icarom is not directly owned by Ireland but rather held through SAT. Unless it meets the definition of "organ" as defined in §§ 1603(b)(2) it would not qualify as an "instrumentality of a foreign state." See id.; see also Gates, 54 F.3d at 1462.
 
 
 20
 B. The record is unclear as to whether Icarom is an organ of a foreign state.
 
 
 21
 Even though a majority of Icarom's shares are not directly held by Ireland, it is still possible for it to be an "organ" of a foreign state as defined by §§ 1603(b)(2). In determining whether an entity is an organ, we consider whether the entity "engages in a public activity on behalf of the foreign government." Patrickson, 251 F.3d 795, 807. Factors that we consider include "the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." Id.
 
 
 22
 The federal courts have recognized as organs such quasipublic entities as national banks, state universities and public television networks. "In Gates, we held that an industry board that regulated the Canadian pork market was an organ where it exercised regulatory authority delegated by the government; its decisions could be appealed to a government agency; and its members enjoyed immunity from suit for their official duties." Id. We held the board was an organ even though the government was not involved in the day-to-day activities and the board was supported by fees levied upon the hog producers. Gates, 54 F.3d at 1460-61. At the same time, we held that an ordinary pork processing plant could not be considered an organ. Id. In Corporacion Mexicana de Servicios Maritimos v. M/T Respect, 89 F.3d 650 (9th Cir. 1996), we held that a Mexican oil refinery was an organ where it was entirely owned by the government; controlled by government appointees; employed only public servants; and had the exclusive responsibility for refining and distributing Mexican government property. Id. at 655.
 
 
 23
 Most recently, in Patrickson, we held that two chemical companies, the "Dead Sea Companies," were not organs. The Dead Sea Companies were both subsidiaries of a governmentowned and-controlled company, Israel Chemicals Limited. Patrickson, 251 F.3d 795, 805. These companies were classified as "government companies" under Israeli law and the government had various privileges reflecting its ownership stake. Id. at 808. "The government had the right to approve the appointment of directors and officers, as well as any changes in the capital structure of the Companies, and the Companies were obliged to present an annual budget and financial statement to various government ministries. The government could constrain the use of the Companies' profits as well as the salaries of the directors and officers." Id. Despite the Israeli government's control over the companies, we held that it was a "close question" but that these companies were not organs. Id. at 808. We reasoned that the Israeli government's control:
 
 
 24
 is not considerably different from the control a majority shareholder would enjoy under American corporate law. In contrast to the oil refinery in Corporacion Mexicana, the Dead Sea Companies were not run by government appointees; their employees were not treated as civil servants; nor were the Companies wholly owned by the government of Israel. The Companies could sue and be sued, and could in fact sue the government of Israel (although official Israeli documents describe such disputes as between "a government company and another government body"). Nor did the Companies exercise any regulatory authority, as did the entity in Gates. These factors support the district court's view of the Companies as independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives.
 
 
 25
 Id. at 808 (emphasis added).
 
 
 26
 Based upon the current record, we are unable to determine whether Icarom is an organ of Ireland. Favoring organ status is that it appears Ireland acquired ICI/Icarom not for profit-making purposes, but to serve the public interest. From the Irish government's press release it appears Ireland took control of ICI to save it and the Irish economy from potential financial collapse. Ireland paid only a nominal amount for ICI and placed its economic and political resources behind ICI to ensure its continued operation. This was ostensibly done to ensure that a large percentage of Irish employers and employees were guaranteed continued insurance coverage and to avoid the harm to the Irish economy that might result if ICI collapsed.
 
 
 27
 Further supporting organ status are several statements made by Icarom's counsel at oral argument. Counsel represented that after ICI was acquired by Ireland in 1985, it did not write any more policies; it acted only in a "run-off " capacity paying out claims on past policies. The implication was that the old ICI/new Icarom did not earn any revenues or profits after 1985 and only existed to pay off past liabilities. The documentary record on this issue, however, seems to contradict counsel's assertions, suggesting Icarom may remain essentially an ordinary insurance company, notwithstanding the Irish government's involvement. The Guarnori declaration suggests that ICI may have sold insurance policies until at least August 1, 1990 when the "Irish Business " was sold to Assurances Generales De France. Additionally, it is unclear from the Guarnori declaration whether Icarom continued to sell policies outside of Ireland after August 1, 1990.
 
 
 28
 Other factors weighing against Icarom being an organ of Ireland include statements made by Icarom's counsel that Icarom's employees are not public servants and that Icarom is subject to suit in Ireland. On the other hand, Icarom's holding company, SAT, is entirely composed of government employees who serve at the behest of the Minister and hold their shares in trust for the Minister.[2] Moreover, although Icarom's day-to-day activities are not controlled by the Irish government, the court-appointed administrator -according to counsel -reports to the Minister notwithstanding the press release's statement that the administrator is responsible to the court.
 
 
 29
 In summary, on the current record on appeal we cannot determine whether Icarom qualifies as an organ of Ireland. Counsel's assertions at oral argument for the most part support Icarom's claim of status as an organ. Assertions, however, are not part of the factual record. See Las Vegas Nightlife, Inc., v. Clark County, 38 F.3d 1100, 1102 (9th Cir. 1994) (noting that statements made by counsel at oral argument are not evidence and not part of the record). Given the incompleteness of the record before us, and the ambiguities we have noted, we believe it is most prudent and efficient to remand this case to the district court so it may conduct an appropriate factual inquiry to determine Icarom's status as an organ of Ireland within the meaning of the FSIA. On remand, the district court can conduct such proceedings as may be necessary to resolve the question of its jurisdiction under the FSIA and -assuming the issue has any relevance -the court's diversity jurisdiction.
 
 CONCLUSION
 
 30
 For the foregoing reasons, we hold that Icarom is not a foreign state under the "majority owned" prong of the FSIA. We remand to the district court for further factfinding and resolution of whether Icarom qualifies as an organ of Ireland so as to sustain FSIA jurisdiction on that ground. If the court finds that Icarom is not such an organ and the parties contest the issue of diversity jurisdiction, the court shall resolve that issue as well. Absent FSIA or diversity jurisdiction, the court shall dismiss the action and remand it to the Montana state court. If the district court finds jurisdiction, the panel shall retain jurisdiction over all further appeals.
 
 
 31
 REMANDED for proceedings consistent with this disposition.
 
 
 
 Notes:
 
 
 [1]
 Our statement of the facts is not binding on the district court on remand. To the extent the district court is presented with additional or conflicting facts, it should make its own factual findings.
 
 
 [2]
 We assume without deciding that SAT is an organ or instrumentality of Ireland. SAT's status, however, is not the relevant issue: the question is whether ICI, the next level down in the corporate structure, satisfies the criteria of an organ. Compare Gates, 54 F.3d at 1461; Patrickson, at 807-08.