

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-2003

# USX Corp v. Adriatic Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 00-3424

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USX Corp v. Adriatic Ins Co" (2003). *2003 Decisions.* Paper 226.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/226

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 25, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3424

USX CORPORATION; BESSEMER AND
LAKE ERIE RAILROAD COMPANY

v.

ADRIATIC INSURANCE COMPANY; AG GROUP, The
Successor in Interest to SECURITAS A.G.; AIU
INSURANCE COMPANY; ALLIANZ UNDERWRITERS
INSURANCE COMPANY; ALLIANZ VERSICHERUNGS A.G.;
ALLSTATE INSURANCE COMPANY, The Successor in
Interest to NORTHBROOK EXCESS & SURPLUS
INSURANCE COMPANY and NORTHBROOK INSURANCE
COMPANY; AMERICAN INSURANCE COMPANY;
AMERICAN REINSURANCE COMPANY; AON
CORPORATION, The Successor in Interest to UNION
INDEMNITY INSURANCE COMPANY OF NEW YORK;
ARKWRIGHT MUTUAL INSURANCE COMPANY; ATLANTA
INTERNATIONAL INSURANCE COMPANY; BIRMINGHAM
FIRE INSURANCE COMPANY; CENTENNIAL INSURANCE
COMPANY; CONTINTENTAL CASUALTY COMPANY;
CONTINTENTAL INSURANCE COMPANY; DANIELSON
NATIONAL INSURANCE, The Successor in Interest to the
MISSION INSURANCE COMPANY; EMPLOYERS MUTUAL
CASUALTY COMPANY; EUROPEAN GENERAL
REINSURANCE COMPANY OF ZURICH; EVANSTON
INSURANCE COMPANY; EXCESS INSURANCE COMPANY,
LTD.; FEDERAL INSURANCE COMPANY; FIREMAN'S
FUND INSURANCE COMPANY; FIRST STATE INSURANCE
COMPANY; GOVERNMENT EMPLOYEES INSURANCE
COMPANY; GRANITE STATE INSURANCE COMPANY;
HAFTPFLICHTVERBAND DER DEUTSCHEN INDUSTRIE

VERSICHERUNGSVEREIN A.G.; HARTFORD ACCIDENT AND INDEMNITY COMPANY; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; INTERNATIONAL INSURANCE COMPANY; LEXINGTON INSURANCE COMPANY; NATIONAL CASUALTY COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; NORTHBROOK EXCESS & SURPLUS INSURANCE COMPANY; NORTHBROOK INSURANCE COMPANY; ROTTERDAMSE ASSURANTIEKAS N.V.; ST. PAUL SURPLUS LINE INSURANCE COMPANY; SENTRY INSURANCE, A MUTUAL COMPANY, As Assumptive Reinsurer of the GREAT SOUTHWEST FIRE INSURANCE COMPANY; SWISS REINSURANCE COMPANY; TUDOR INSURANCE COMPANY; TWIN CITY FIRE INSURANCE COMPANY; UNITED STATES FIRE INSURANCE COMPANY; VANLINER INSURANCE COMPANY, The Successor in Interest to The GREAT SOUTHWEST FIRE INSURANCE COMPANY; WESTCHESTER FIRE INSURANCE COMPANY; ZURICH INSURANCE COMPANY; ZURICH INTERNATIONAL LTD; CERTAIN OF THE UNDERWRITERS AND INTERNATIONAL INSURERS SUBSCRIBING TO LLOYD'S POLICY NOS. 77DD2126C, 78BH3189, 78BH3190, 78BH3191, PY021577, PY021378/78DD1459C, 79BH1269, 79BH1270, 78DD1406C, 79BH1271, 79BH1272, 80DD19C/PY021379, 79BH5311, 79BH5312, PY135179, PY021379A, 80BH0659, 80BH0660, 80BH0661, 80BH0662, PY172180/80DD2562C, PY172280/80DD2563C, HA081280/LBM/1HB06910, 2KA42270/HA081281/LBN, KY019382, KY019482, KY021982, AND KY021882; ICAROM, Formerly known as INSURANCE CORPORATION OF IRELAND; ICAROM plc, formerly known as INSURANCE CORPORATION OF IRELAND

USX Corporation and Bessemer and Lake Erie Railroad Company

*Appellants*

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 95-00866)
Honorable Gustave Diamond, District Judge

———————

Argued April 3, 2001
Reargued August 1, 2003

BEFORE: ROTH, STAPLETON, and GREENBERG,
*Circuit Judges*

(Filed: September 25, 2003)

———————

Lawrence E. Flatley
George L. Stewart II
Traci Sands Rea
John A. Camp
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219

J. Michael Jarboe
 (argued on April 3, 2001,
 and August 1, 2003)
Law Department of U.S. Steel
 Corporation
600 Grant Street, 15th Floor
Pittsburgh, PA 15219

*Attorneys for Appellants USX
Corporation and Bessemer and
Lake Erie Railroad Company*

Martin R. Baach
Stephen H. Marcus
Geovette E. Washington (argued
 on August 1, 2003)
Baach, Robinson & Lewis
One Thomas Circle, Suite 200
Washington, DC 20005-5803

Bernard D. Marcus
Robert L. Allman, II
Marcus & Shapira
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA 15219-6401

James P. Davenport (argued
 on April 3, 2001)
Nussbaum & Wald
One Thomas Circle
Suite 200
Washington, DC 20005

>*Attorneys for Appellees Certain Underwriters at Lloyd's, London and Certain Companies in the London Market*

William H. Briggs, Jr.
Leslie S. Ahari
Benjamin C. Eggert
Ross, Dixon & Bell
2001 K Street, N.W.
Washington, D.C. 20006-1040

>*Attorneys for Appellees Continental Casualty Company and Continental Insurance Company*

Stephen A. Cozen (argued on
 April 3, 2001, and August 1, 2003)
Jay M. Levin
Gaele McLaughlin Barthold
Cozen & O'Connor
1900 Market Street
The Attrium
Philadelphia, PA 19103

   *Attorneys for Appellees AIU*
   *Insurance Company; Birmingham*
   *Fire Insurance Company; Granite*
   *State Insurance Company;*
   *Insurance Company of the State of*
   *Pennsylvania; Lexington Insurance*
   *Company; National Union Fire*
   *Insurance Company of Pittsburgh,*
   *Pennsylvania; and Certain of the*
   *Underwriters at Lloyd's*

Wendy L. Mager
Grayson Barber
Smith, Stratton, Wise, Heher
 & Brennan
600 College Road East
Princeton, NJ 08540

Anthony W. Hinkle
Cipriana & Werner
1100 Two Chatham Center
112 Washington Place
Pittsburgh, PA 15219

   *Attorneys for Appellee Centennial*
   *Insurance Company*

R. Kenneth Willman
Willman & Arnold
705 McKnight Park Drive
P.O. Box 15276
Pittsburgh, PA 15237

   *Attorneys for Appellees Arkwright*
   *Mutual Insurance Company and*
   *Employers Mutual Casualty*
   *Company*

Richard S. Dorfzaun
David B. Fawcett, Jr.
Dickie, McCamey & Chilcote
Suite 400, Two PPG Place
Pittsburgh, PA 15222-5402

*Attorneys for Appellee National Casualty Company*

Thomas V. Gebler, Jr.
Robb, Leonard & Mulvihill
Suite 2300 One Mellon Bank Center
Pittsburgh, PA 15219

*Attorneys for Appellee Federal Insurance Company*

Roderick T. Dunne
Karbal, Cohen, Economou,
 Silk & Dunn
200 South Michigan, 21st Floor
Chicago, IL 60604

James A. Mollica
Mollica & Murray
1305 Grandview Avenue
450 Trimont Plaza
Pittsburgh, PA 15211

*Attorneys for Appellee Evanston Insurance Company*

Elit R. Felix II
Margolis Edelstein
The Curtis Center, 4th Floor
Independence Square West
6th and Walnut Streets
Philadelphia, PA 19106-3304

*Attorneys for Appellees Allianz Underwriters Insurance Company; Atlanta International Insurance Company; Tudor Insurance Company; and Atlanta International Insurance Company*

Robert A. Arcovio
Judy Thomas
Margolis Edelstein
1500 Grant Building
Pittsburgh, PA 15219

*Attorneys for Appellees American Insurance Company and Fireman's Fund Insurance Company*

C. Leon Sherman
C. Leon Sherman & Associates
20 Stanwix Street, Fifth Floor
Pittsburgh, PA 15222

George R. Hardin
Hardin, Kundla, McKeon, Poletto & Polifroni
673 Morris Avenue
P.O. Box 730
Springfield, NJ 07081

*Attorneys for Appellees International Insurance Company; United States Fire Insurance Company; and Westchester Fire Insurance Company*

William Savino
Michael Cassell
Chris Fichtl
Rivkin, Radler
10th Floor
EAB Plaza
West Tower
Uniondale, NY 11566

*Attorneys for Appellees American Reinsurance Company; Government Employees Insurance Co.; Sentry Insurance Company, Assumptive Reinsurer of the Great Southwest Fire Insurance Company; and Vanliner Insurance Company, the Successor in Interest to the Great Southwest Fire Insurance Company*

Jeffrey Bouslog
Oppenheimer, Wolff & Donnelly
Plaza VII, Suite 3400
45 South Seventh Street
Minneapolis, MN 55402-1609

Kevin P. Lucas
Manion, McDonough & Lucas
600 Grant Street
Suite 882
Pittsburgh, PA 15219

*Attorneys for Appellee St. Paul
Surplus Line Insurance Company*

Louis C. Long
Meyer, Darragh, Buckler, Bebenek
 & Eck,
2000 Frick Building
Pittsburgh, PA 15219

*Attorneys for Appellee Zurich
Insurance Company*

Arthur J. Liederman
Morrison, Mahoney & Miller
100 Maiden Lane
New York, NY 10038

*Attorney for Appellees Adriatic
Insurance Company; Allianz
Versicherungs A.G.; European
General Reinsurance Company of
Zurich; Haftpflichtverband der
Deutschen Industrie
Versicherungsverein A.G.; and
Swiss Reinsurance Company*

Allen D. Windt
Suite 230
27 West Atkins Avenue
Ardmore, PA 19003

*Attorney for Appellee Excess Insurance Company, Ltd.; First State Insurance Company; Hartford Accident & Indemnity Company; and Twin City Fire Insurance Company*

---

## OPINION OF THE COURT

---

GREENBERG, *Circuit Judge*.


## I.  INTRODUCTION

This matter comes on before this court on appeal from a summary judgment entered for the defendants and from orders denying motions to remand this insurance policy coverage case to the state court in which it had been initiated. This litigation, though not reaching trial, has been protracted and has followed complex underlying proceedings in other consolidated cases. Though, as will be seen, we summarily will resolve the substantive issue before us which we find not to be difficult, we nevertheless set forth the background of the case in some detail.

Appellants USX Corporation and Bessemer and Lake Erie Railroad Company ("B&LE"), its subsidiary at the times material to this action (together herein usually called "USX"), have sought indemnification from the approximately 50 appellees ("insurers") under umbrella liability insurance policies the insurers issued to USX.[1] These policies were developed for a program which USX initiated in the 1970s when, in consultation with its domestic insurance broker, Marsh & McLennan, it

---

1. USX's most recent corporate disclosure statement under Fed. R. App. P. 26.1 indicates that B&LE is now a wholly owned subsidiary of Great Lakes Transportation, LLC, a Delaware limited liability company.

determined to obtain insurance for catastrophic liabilities. Ultimately USX obtained liability insurance in furtherance of this program covering seven periods from May 12, 1977, to April 1, 1983. From May 12, 1977, through December 1, 1979, the programs included between four and six layers of insurance providing $128.1 million to $151 million of coverage for liability imposed in excess of a $50 million self-insured retention. From December 1, 1979, to April 1, 1983, the programs involved between six and seven layers of insurance providing between $275 million and $325 million of coverage in excess of a $25 million self-insured retention. The multi-layered umbrella policies included broad comprehensive coverage based on London umbrella insurance policies and provided:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability:
>
> (a) imposed upon the Assured by law . . . for damages on account of:
>
> > (i) Personal Injuries
> >
> > (ii) Property Damage
> >
> > (iii) Advertising Liability,
>
> caused by or arising out of each occurrence happening anywhere in the world.

Joint App. at 133.[2] The term "Personal Injuries" was defined as:

> bodily injury . . . mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights

---

2. USX explains that the various policies issued were "in all respects material to this dispute . . . identical to the 1971 London umbrella form." Br. at 10-11. In this opinion we refer to the original appendix filed in this court as "Joint App." and the appendix filed after the remand on the jurisdictional issue that we describe below as "Juris. J.A."

of privacy, except that which arises out of any advertising activities.

Joint App. at 135. The policies, however, excluded coverage for liability arising out of discrimination based on race, creed, color or national origin. "Advertising liability" included:

1) Libel, slander or defamation;

2) Any infringement of copyright or of title or of slogan;

3) Piracy or unfair competition or idea misappropriation under an implied contract;

4) Any invasion of right of privacy;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Named Assured's advertising activities.

Joint App. at 135-36. The term "occurrence" was defined as:

an accident, or a happening, or an event, or a continuous or repeated exposure to conditions, which unexpectedly and unintentionally results in a personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

Joint App. at 136.

In 1982, B&LE pleaded *nolo contendere* to an indictment in the United States District Court for the District of Columbia for a violation of the Sherman Antitrust Act, 15 U.S.C. § 1, for participating in a conspiracy in restraint of trade. The district court convicted and sentenced B&LE and on appeal the court of appeals affirmed. *United States v. Bessemer & Lake Erie R.R. Co.,* 717 F.2d 593 (D.C. Cir. 1983). The criminal case was followed by massive civil litigation in which numerous entities involved in the lower Lake Erie iron ore transportation market (including five steel companies, three dock companies and three trucking

companies) filed ten separate civil suits in various United States district courts against several railroads (including B&LE) which operated docks to receive iron ore and from which to transport the ore to inland steel mill locations. The complaints alleged that the railroads had agreed to restrain trade by denying or preventing the introduction of self-unloading vessels and by preventing non-railroad-owned docks and trucking firms from participating in the transportation of iron ore from the upper Great Lakes and Eastern Canada to discharge ports on the lower Great Lakes and the Detroit River.

The ten civil cases were consolidated and transferred to the United States District Court for the Eastern District of Pennsylvania in April 1984 and became known as MDL 587, the *In re Lower Lake Erie Iron Ore Antitrust Litigation*. The court tried MDL 587 in two phases, a liability phase followed by a damage phase. The jury in the liability phase rendered verdicts determining that B&LE had participated with the other railroads in a conspiracy to restrain trade in nine of the ten cases in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Ohio law. In eight of the cases, the jury awarded substantial damages for losses the MDL plaintiffs suffered, and thereafter the court entered final judgments reflecting trebled damages under the federal antitrust laws and double damages under Ohio law. According to USX, the district court entered final judgments totaling $638.5 million against B&LE which ultimately satisfied them by paying over $592 million. The cases against the defendants other than B&LE were settled or dismissed before or during the trial leaving it as the sole defendant. B&LE appealed to this court but on May 27, 1993, we affirmed the district court's judgment against it. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1146 (3d Cir. 1993). B&LE filed a petition for certiorari but the Supreme Court denied it and thus the underlying litigation is over.

In particular certain of the facts related to the conspiracy are as follows. The railroads owned docks which used "huletts" or heavy cranes to unload ore from standard freighters ("bulkers") to railroad cars to be transported to inland steel mills. As technology advanced self-unloaders

were developed that eliminated the need for huletts and made the railroads' unloading equipment obsolete. Furthermore, use of self-unloaders would have permitted unloading of ore at private docks the railroads did not own and would have made it possible for ore to be shipped inland in trucks rather than on railroad cars.

In the appeal in the civil antitrust suit we explained that the railroads accomplished the restraint of trade and delayed the introduction of self-unloaders:

> [b]y charging the same rate for unloading a self-unloader as for unloading a bulker, by refusing to approve commodity line haul rates from private docks which would have handled self-unloaders, and by concertedly refusing to make dock property available for use by private docks . . . .

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1168. The railroads charged tariffs that assessed the same dock handling service charges for self-unloading vessels as for conventional vessels, even though they provided much greater services for the conventional vessels. Moreover, the railroads charged certain shippers and competitors transportation rates from railroad-owned docks to steel mills that were much lower than the transportation rates available from private docks to the steel mills. Certain railroads also refused to sell or lease property for use as private iron ore docks.

The policies did not include the usual provisions providing for the insurers to defend the insured for claims within the policies, and in fact, the insurers did not defend B&LE in the *In re Lower Lake Erie Litigation.* USX, however, did seek indemnity from the insurers after the judgment against B&LE was entered. The insurers refused this demand and consequently on March 31, 1995, USX filed a coverage action in the Court of Common Pleas of Allegheny County, Pennsylvania, naming most of the insurers who had participated in its catastrophic liability insurance program from May 12, 1977, to April 1, 1983, as defendants. ICAROM plc ("ICAROM"), one of the named defendants and the successor to the Insurance Corporation of Ireland ("ICI"), removed that action to the United States

District Court for the Western District of Pennsylvania on the grounds that it was an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603 ("section 1603"), a provision of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA"), and thus could remove the action pursuant to 28 U.S.C. § 1441(d) ("section 1441(d)") which provides that a foreign state may remove a state court action to the district court. Section 1441(d) compliments 28 U.S.C. § 1330(a) which gives district courts jurisdiction over actions against foreign states as defined in section 1603(a). An "agency or instrumentality of a foreign state" is itself a foreign state within sections 1441(d) and 1603.

On May 18, 1995, USX voluntarily dismissed its first Common Pleas Court action without prejudice and initiated the current action in the same court by filing a complaint identical to its original complaint except that it excluded as defendants any entity that was an "agency or instrumentality of a foreign state" within the meaning of section 1603 and did not include ICAROM. Br. of Appellants at 6; Joint App. at 372. Three of the named insurers then filed separate third-party complaints joining ICAROM as a third-party defendant, asserting claims for contribution against it.

ICAROM reacted by again filing a notice of removal pursuant to section 1441(d), claiming that it was an agency or instrumentality of a foreign state within the meaning of section 1603. USX countered by filing a motion to remand the action to the state court on the ground that ICAROM was not an agency or instrumentality of a foreign state. By an order dated July 18, 1995, the district court stayed all proceedings, including discovery, pending disposition of the jurisdictional issue that USX raised by its motion to remand. The district court subsequently denied the motion to remand as well as USX's related motion to engage in jurisdictional discovery by a comprehensive opinion and order dated March 29, 1996, and entered April 1, 1996, as it found that ICAROM was an agency or instrumentality of a foreign state.

The court then lifted the stay and the parties engaged in substantive discovery following which all parties filed

motions for summary judgment. On March 22, 2000, the court issued a comprehensive opinion and order granting the insurers' motions for summary judgment and denying USX's motion for partial summary judgment. *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593 (W.D. Pa. 2000).

USX timely appealed from the orders of April 1, 1996, and March 22, 2000, and, following briefing and oral argument, we entered an order on May 1, 2001, without an accompanying opinion, reversing the order of April 1, 1996, but only to the extent that it denied USX's motion for leave to engage in discovery with respect to subject matter jurisdiction. We did not, however, disturb the order for summary judgment. In the same order we remanded the case to the district court to allow discovery on the jurisdictional issue and, even though we retained jurisdiction, we authorized USX to move in the district court at the completion of jurisdictional discovery for an order vacating the final judgment in the case and remanding the case to the state court. Our order further provided for the parties to file supplemental briefs in this court after completion of the remand proceedings.[3] In fact, the parties engaged in jurisdictional discovery on the remand following which USX again moved to remand the case to the state court. On September 11, 2002, the district court issued another comprehensive opinion and order denying the motion to remand.[4] In that opinion the district court deemed the notice of removal amended to correct any asserted deficiency in it.

After the district court rendered its September 11, 2002 opinion and order but before the parties filed their supplemental briefs and before we rescheduled oral

---

3. If the district court had vacated the final judgment and remanded the case to the state court presumably the appeal would have become moot and we would have dismissed it. We are not concerned here with whether 28 U.S.C. § 1447(d) then would have precluded the insurers from appealing.

4. The district court had issued yet another comprehensive opinion in this case regarding a matter not in issue on this appeal on September 30, 1998. *See USX Corp. v. Adriatic Ins. Co.*, 64 F. Supp. 2d 469 (W.D. Pa. 1998).

argument, the parties filed a joint motion asking us to hold the case in abeyance until the Supreme Court decided the appeal in *Dole Food Co. v. Patrickson*, 123 S.Ct. 1655 (2003), as they anticipated, correctly as it turned out, that *Dole* would resolve an aspect of the jurisdictional question we were to consider on the appeal. We granted that motion and then, after the Court decided *Dole*, the parties filed their supplemental briefs and we scheduled and entertained oral argument and now decide the case in this opinion. Even though USX did not file an amended notice of appeal to encompass the September 11, 2002 order, in view of the unusual circumstance that we remanded the case to the district court but retained jurisdiction, we will treat the appeal as including that order though it is not specifically listed in the notice of appeal.

## II.   DISCUSSION

There are two overarching issues on this appeal. First, USX contends that the district court did not have subject matter jurisdiction because the only asserted basis for exercise of such jurisdiction is that ICAROM, a third-party defendant, is a foreign state within the meaning of the FSIA as "an agency or instrumentality" of the Republic of Ireland whereas it is no such thing. Thus, in USX's view the district court should have granted its motion to remand and never have addressed this case on the merits. It further contends that the insurers are barred by waiver for reasons that we will explain below from raising an aspect of their argument supporting the district court's exercise of jurisdiction. Second, USX contends that if the district court had jurisdiction it erred in granting the insurers summary judgment on the merits. We, of course, consider the jurisdictional issue first.

### A.   *THE JURISDICTIONAL QUESTION*

The district court's ruling that ICAROM is an agency or instrumentality of a foreign state for purposes of subject-matter jurisdiction under the FSIA presents a question of law subject to plenary review, and we exercise plenary review over the denial of the motion to remand. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 665 (3d Cir. 2002); *Fed.*

*Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1282 (3d Cir. 1993). While we would review the district court's factual findings for clear error if they were disputed, *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 15 F.3d 1230, 1238 n.8 (3d Cir. 1994), there are no disputes of historical fact here, and thus we reject the insurers' contention that we should review the district court's finding that ICAROM was an agency or instrumentality of a foreign state deferentially for clear error. Indeed, USX indicates that it "does not dispute the District Court's factual findings relating to ICI/ICAROM's alleged organ status." Reply Br. at 9. We review the district court's decision to deem the notice of removal amended to correct any asserted deficiency in it on an abuse of discretion basis. *See Scattergood v. Perelman*, 945 F.2d 618, 627 (3d Cir. 1991). The district court exercised jurisdiction pursuant to section 1441(d) which permits foreign states as defined in the FSIA to remove actions brought against them to the district court and we have jurisdiction under 28 U.S.C. § 1291.

Section 1603, which is as we have indicated a provision of the FSIA, provides:

> For purposes of this chapter —

> (a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

> (b) An 'agency or instrumentality of a foreign state' means any entity—

>> (1) which is a separate legal person, corporate or otherwise, and

>> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

>> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

(c) The 'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

Significantly section 1603(b)(2) is two-pronged as it specifies that an entity may be an "agency or instrumentality" by reason of being owned by a foreign state or being its organ.

Originally the district court denied the motion to remand on the basis of its finding that the Republic of Ireland owned "a majority" of ICAROM's shares, a conclusion it reached because the court determined that the "tiered" ownership through which Ireland owned ICAROM, *i.e.*, the ownership of an entity that in turn owned ICAROM, was sufficient to establish Ireland's ownership of ICAROM itself for purposes of the FSIA. Following the remand the district court adhered to that conclusion and, in addition, held that ICAROM was an agency or instrumentality of Ireland as its "organ," a finding that it had not made in its April 1, 1996 opinion. Thus, as it originally had done, it determined that it had jurisdiction and denied the motion to remand.

In *Dole*, however, after the district court denied USX's renewed motion to remand, the Supreme Court rejected the "tiered" ownership theory under the FSIA as it held that a subsidiary of an instrumentality is not itself an instrumentality. The parties agree that *Dole* is controlling here to the extent that the district court upheld its exercise of jurisdiction predicated on the majority ownership prong of section 1603(b)(2), and thus we cannot affirm its order denying remand on the basis of that conclusion. The insurers contend, however, that the district court did have jurisdiction inasmuch as ICAROM is, as the district court held, an organ of the Irish government and by reason thereof is its agency or instrumentality. USX answers that the insurers cannot rely on the organ prong of section 1603(b)(2) for determining if ICAROM is an agency or instrumentality of Ireland as they have waived their right to do so, and, in any event, ICAROM is not an organ of the Irish government.

In view of the jurisdictional discovery and the submissions of the parties we know a great deal about

ICAROM which, as we have indicated, formerly was known as the Insurance Corporation of Ireland.[5] ICI was incorporated as a limited liability company in Dublin in 1935 and rapidly grew to become the largest liability and marine insurer in Ireland. In the 1970s it expanded its operations into foreign markets, including the London Insurance Market. In 1981, Allied Irish Banks ("AIB") acquired 25% of ICI, and in 1983 purchased the remainder of ICI and assumed its full control. By 1984, however, AIB determined that ICI's continued viability was in question, due in part to losses associated with its London business.

In early 1985, AIB informed the Irish government of ICI's precarious position. At the time, AIB was one of the largest banks in Ireland, and ICI was a leading insurer to corporate Ireland. On March 15, 1985, the Irish government, hoping to avoid ICI's collapse and to minimize the general economic repercussions that such a collapse could trigger, took emergency action. AIB transferred all shares of ICI for the nominal sum of IR 5 to Gebhard Limited ("Gebhard"), a shelf company that an Irish law firm assisting the Irish government had formed to acquire the ICI shares. Gebhard then assumed a guarantee AIB previously had given to the Institute of London Underwriters on behalf of ICI. The agreement to assume the guarantee was subject to approval by the Irish Minister for Industry, Trade, Commerce, and Tourism ("the Minister"). Two high-ranking civil servants held Gebhard's only two shares[6] in trust for the Minister. That same day, ICI was placed into administration pursuant to the Insurance Act of 1983 ("the 1983 Act") authorizing appointment of an administrator to take over the management of insolvent insurers for the purpose of placing them on sound commercial and financial footing, a process similar to comparable American proceedings. The statute authorizes the administrator to access the Insurance Compensation Fund ("ICF"), a mechanism used to channel funds to finance insurers' operations. The Minister nominated William McCann, a partner in the

5. The district court in its comprehensive opinion of September 11, 2002, set forth the facts related to ICAROM in great detail.

6. Under Irish law, a company such as Gebhard that is not a public limited company ("plc") must have at least two shareholders.

accounting firm of Gregg, Gardner & Company, as ICI's provisional administrator, and Ireland's High Court made his appointment permanent on March 25, 1985.

On March 20, 1985, Gebhard changed its name to Sealuchais Arachais Teoranta ("SAT"). SAT had no employees and was simply a holding company, which, as the Minister described in an address to Parliament, had no "influence over the management of the company in administration . . . because the company in administration is managed by the administrator who has set aside the board of the company in administration and is acting in accordance with the law and the directions of the court." Juris. J.A. at 297.

On April 8, 1985, the Irish Parliament passed the Insurance (Miscellaneous Provisions) Act of 1985 ("the 1985 Act"), retroactively authorizing the acquisition of SAT (formerly Gebhard) effective as of March 15, 1985. The 1985 Act further provides that the Minister may hold the shares of SAT as he or she sees fit and that SAT's shareholders must hold the shares in trust for the Minister and pay all dividends or other monies received to the Minister for the benefit of the Exchequer. Moreover, the 1985 Act provides that the Minister may require the shareholders to transfer their shares back to the Minister or his designee and that upon the death of a shareholder, the shares automatically vest in the Minister without the need for any transfer of shares. The 1985 Act authorizes the Minister to appoint the directors of SAT after consultation with the Minister of Finance and provides that the directors hold office on terms and conditions the Minister determines subject to being removed by him or her at any time. Finally, the 1985 Act authorizes the Minister to guarantee payment by ICI under certain insurance policies issued by the Institute of London Underwriters and requires the Minister to report to Parliament concerning payments made under such guarantee.

Because Irish law requires a public limited company ("plc") to have at least seven shareholders, the government arranged for legal title to six of ICI's 120 million commons shares to be vested in civil servants who hold the shares in trust for the Minister. SAT retained the remaining

119,999,994 shares. Notwithstanding the 1985 Act's provisions allowing the Minister to acquire and hold its shares as the Minister sees fit, the Minister never has acquired direct legal title to the shares of SAT.

In 1990, the administrator negotiated the sale of ICI's ongoing insurance operations in Ireland ("the Irish Business"), as well as ICI's trade name and goodwill. The administrator sought and obtained permission from the government to test the market for such a sale and subsequently initiated a competitive process to generate tender offers from outside companies. When the field was reduced to two competitors, the administrator made a formal recommendation to the government which the cabinet approved. ICI thereafter sold its trade name and the Irish Business to Orkandale Holdings, Ltd. ("Orkandale"), a subsidiary of Assurances Generales de France ("AGF"). All of ICI's shares were transferred to Orkandale for a short time during which Orkandale exercised a put option that caused all of the assets, other than the Irish Business and ICI's trade name, as well as the ICI shares to revert to SAT. These procedures allowed AGF to take advantage of ICI's tax losses in the range of 150 million. After it shed the Irish Business and the ICI trade name, ICI was renamed ICAROM. ICAROM has not underwritten new business but rather has operated as a "runoff company," the entire purpose of which is to wind up its remaining liabilities, the complete discharge of which is not expected to be accomplished until 2040 or 2050.

According to USX, ICAROM is nothing more than a private company in administration under the 1983 Act authorizing such action for insolvent insurers. It points out that the administrator, not the government, manages and controls ICAROM's day-to-day operations, ICAROM does not have board or shareholder meetings, and no actions, appointments, or other corporate business can be conducted by shareholder vote. The administrator's management of ICAROM is subject only to approval by the High Court. As USX emphasizes, the only other insurer to have operated under administration pursuant to the 1983 Act is an Irish insurance company known as PMPA/Primor ("PMPA"), in which the government never has claimed any

ownership interest. The ICF has provided the outside funding of ICAROM and the government has not funded ICAROM directly. The government has not incurred costs as a result of the operation and administration of ICAROM other than having foregone interest on a 32 million loan that the Irish Exchequer agreed to provide interest-free as part of a 1992 Financing Agreement for ICAROM's benefit.[7]

Notwithstanding the circumstances to which USX alludes, the record demonstrates that the government has played a role in financing ICAROM and in overseeing the administrator's management of the company. The administrator regularly consults with the Department of Enterprise, Trade, and Employment on all significant matters and all major decisions are made with the department's approval. The administrator delivers a formal presentation annually to the Departments of Enterprise, Trade, and Employment and Finance regarding the status of ICAROM's operations and prepares quarterly reports that are forwarded to the same departments. The departments supported the nomination of the current administrator before the High Court and approved the current general manager prior to his appointment by the administrator.

Although the government has not provided funding directly to ICAROM, it has channeled funds into the ICF so that they can be disbursed to ICAROM. Under a 1985 Financing Agreement, 100 million was advanced to the ICF for the benefit of ICAROM. AIB provided 70 million, while the government, through the Irish Central Bank, provided a 30 million loan.[8] Under the 1985 Agreement, interest on the 30 million loan in the amount of 3.5 million per annum was to be paid by AIB and other private banks. In fact, interest rates fell and the interest due was less than the 3.5 million per annum set by the agreement. Although the government was entitled to retain the extra funds (approximately 2.1 million), it disbursed the excess interest payments to ICAROM. In 1992, there was another

---

7. We believe that the government also has had costs in terms of the use of time of its officials on ICAROM matters though our result does not depend on these costs having been incurred.

8. ICAROM repaid in full the 100 million in September of 2000.

Financing Agreement executed whereby AIB made an aggregate payment of 176 million, at a rate of 8.8 million per year for 20 years, to the ICF, while the government, through the Exchequer, contributed the one-time interest-free loan of 32 million discussed above. The foregone interest amounted to approximately 2.1 million per year. ICAROM is expected to repay these advances in 2012.

Finally, ICAROM received, through the ICF, the proceeds of four commercial loans from three separate financial institutions in the amount of 65 million. The Irish Department of Finance guaranteed that the ICF would have sufficient funds to satisfy the obligations on these four loans, as authorized by Irish statute, although it did not directly guarantee them. Those loans have been fully repaid, and the government has not been obligated to make good on its guarantees.

1. *Waiver*

The first aspect of the jurisdictional dispute that we address is whether the insurers waived the right to rely on the "organ" basis of jurisdiction.[9]

ICAROM's notice of removal states:

> Removal of this action is expressly authorized by 28 U.S.C. § 1441(d), which provides, in pertinent part: 'Any civil action brought in a State against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending.'

> ICAROM is a 'foreign state' within the meaning of 28 U.S.C. § 1603(a). That section defines a 'foreign state' as, *inter alia*, 'an agency or instrumentality of a foreign state as defined in subsection (b).' Subsection (b) of § 1603, in turn defines 'an agency or instrumentality of

---

9. We recognize that it could be argued that the insurers other than ICAROM do not have standing to advance the jurisdictional argument inasmuch as only ICAROM could have removed the case. We will not linger on this point, however, inasmuch as ICAROM itself is defending the district court's denial of the motions to remand.

a foreign state' as 'any entity' that (1) 'is a separate legal person, corporate or otherwise,' (2) 'is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof,' and (3) 'is neither a citizen of a State of the United States . . . nor created under the laws of any third country.' *Id.* § 1603(b).

ICAROM meets all of these criteria. It is a corporation organized pursuant to the laws of the Republic of Ireland. A majority of ICAROM's shares or other ownership interest is owned by the government of the Republic of Ireland. ICAROM is neither a citizen of the United States nor created under the laws of any third country. ICAROM is therefore a 'foreign state' within the meaning of 28 U.S.C. § 1603(a).

Joint App. at 492 (alteration in original). USX does not contend that ICAROM does not satisfy the first and third requirements of section 1603(b) for an entity to be an "agency or instrumentality of a foreign state."

Prior to our remand of the case ICAROM argued that it satisfied the second element of section 1603(b) because Ireland owned a majority of its shares and the district court agreed with that contention. On the remand, as we have indicated, the district court adhered to its earlier conclusion that Ireland owned ICAROM through a "tiered" arrangement within the FSIA's definition of majority ownership by a foreign state. Juris. J.A. at 37. Since that time, however, as we also have indicated, the Supreme Court has held that a subsidiary of an instrumentality is not itself entitled to instrumentality status, so that "tiering" arrangements cannot provide the basis for finding foreign state status under the majority ownership prong of section 1603(b)(2). Rather, that prong applies "only if the foreign state itself owns a majority of the corporation's shares." *Dole*, 123 S.Ct. at 1662.

The district court, however, also considered ICAROM's alternative argument on the remand under the "organ" prong of section 1603(b)(2), which ICAROM explicitly first advanced at that time, and held that ICAROM qualified as

an organ of Ireland and thus was its agency or instrumentality. In answer to USX's argument that ICAROM waived the right to invoke the "organ" prong by referencing only the majority ownership prong in the notice of removal, the district court deemed the notice amended under 28 U.S.C. § 1653, which provides that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts," noting that the notice of removal "invoked § 1603 in its entirety" and that ICAROM's "organ" argument "is premised on the same facts that support its invocation of the instrumentality prong." Juris. J.A. at 37-40. ICAROM does not dispute that it initially relied on the majority ownership prong of section 1603(b)(2), but it argues that its notice of appeal nevertheless referenced section 1603 as a whole. It further contends that, in any event, even if it belatedly advanced the organ prong argument it caused USX no prejudice by doing so and its procedure was reasonable inasmuch as before *Dole* it appeared that a tiering arrangement would satisfy the majority ownership prong of section 1603(b)(2) and, indeed, we so had held with respect to ICAROM itself in *In re Texas E. Transmission Corp.*, 15 F.3d at 1238 n.8. It also contends that the same set of facts underlie an analysis under both the ownership and organ prongs of section 1603(b)(2).

Section 1653 gives both district and appellate courts the power to remedy inadequate jurisdictional allegations, but not defective jurisdictional facts. *Newman-Green, Inc. v. Alfonzo Larrain*, 490 U.S. 826, 831-32, 109 S.Ct. 2218, 2222 (1989).[10] Moreover, we have held that a district court abused its discretion by *not* allowing plaintiffs to amend their complaint to allege jurisdiction on diversity grounds where diversity existed but had not been a necessary basis for jurisdiction before the federal claims in the case were dismissed. *Scattergood*, 945 F.2d at 627.

In this case, ICAROM stated all three elements of the "agency or instrumentality" definition in its notice of

---

10. It is clear that USX, initially not contesting ICAROM's foreign state status under section 1603(b), tried to avoid creating a basis for federal jurisdiction by dismissing its initial state court action and then bringing a second state court action omitting ICAROM.

removal, including as part of the second element as defined in section 1603(b)(2) both the majority ownership prong and the organ prong. It then alleged that "ICAROM meets all of these criteria." Joint App. at 492. To be sure, in its brief recitation of the facts supporting that allegation, ICAROM noted that Ireland owned a majority of its shares, thus directly referencing only the majority ownership prong of section 1603(b)(2). Although jurisdiction under that prong cannot be sustained after *Dole*, any possible defect in the notice of removal is of the sort that we ordered the district court to cure with respect to a complaint pursuant to section 1653 in *Scattergood* which seems to us to be persuasive authority in this parallel situation. Here, reliance on the organ prong as a basis for jurisdiction was not clearly required until the Supreme Court clarified that tiering arrangements would not satisfy the majority ownership prong of section 1603(b)(2). Moreover, although, under *Dole*, Ireland does not own ICAROM for purposes of the FSIA, its mistaken allegation to that effect bears on a point central to the organ inquiry, namely, Ireland's control over ICAROM.

Thus, the same allegations contained in the notice of removal, amended only to clarify that Ireland controls, rather than owns, ICAROM through SAT, support the crucial allegation of the notice, namely, that ICAROM satisfies all the requirements to be an agency or instrumentality of Ireland as set forth in section 1603(b). In other words, although the allegation of ownership most clearly relates to the majority ownership prong of section 1603(b)(2), it is also highly relevant to ICAROM's organ status. The district court's amendment of the notice pursuant to section 1653 therefore did not add new jurisdictional facts and did not rely on a basis of jurisdiction different from that originally alleged,[11] namely

---

11. USX cites a number of cases disallowing amendments creating an entirely new basis for jurisdiction. *See, e.g.*, *Blakeley v. United Cable Sys.*, 105 F. Supp. 2d 574, 579-80 (S.D. Miss. 2000); *Iwag v. Geisel Compania Maritima, S.A.*, 882 F. Supp. 597, 601 (S.D. Tex. 1995); *see also* 14C Charles Alan Wright et al., *Federal Practice and Procedure* § 3733, at 358-61 (3d ed. 1998) ("[A]mendment of the removal notice . . . may correct an imperfect statement of citizenship, or state the previously

that ICAROM is an agency or instrumentality of Ireland under section 1603. All it did was amend the ownership allegation in light of an intervening clarification in the law.[12]

---

articulated grounds more fully, or correct the jurisdictional amount. Completely new grounds for removal jurisdiction may not be added and missing allegations may not be furnished, however.") (footnote omitted). These cases are inapposite, however, as new grounds for removal have not been added and new factual allegations have not been made.

12. ICAROM submitted the affidavit of Brendan Murphy, its former general manager, in opposition to USX's original motion to remand setting forth the history and purpose of the government's involvement with ICAROM and other facts that pertain not only to the majority ownership analysis but to the organ analysis. The Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal. *Willingham v. Morgan*, 395 U.S. 402, 407 n.3, 89 S.Ct. 1813, 1816 n.3 (1969) ("This material should have appeared in the petition for removal. However, for purposes of this review it is proper to treat the removal petition as if it had been amended to include the relevant information contained in the later-filed affidavits. *See* 28 U.S.C. § 1653."). Other courts more recently have allowed consideration of facts contained in later-filed affidavits, treating those facts as an amendment of the notice of removal under section 1653. *See, e.g.*, *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n.1 (9th Cir. 2002) (holding that the district court did not err in construing an affidavit setting forth the facts supporting the amount in controversy in a diversity case as an amendment under section 1653 to the notice of removal which stated summarily, without alleging any underlying facts, that the amount in controversy exceeded $75,000); *cf. Miller v. Principal Life Ins. Co.*, 189 F. Supp. 2d 254, 257-58 (E.D. Pa. 2002) (holding that, even assuming that the defendant's initial removal petition was defective in that it did not state that a codefendant was only a nominal defendant, *Willingham* permitted treatment of an amended notice of removal filed more than 30 days after the filing of the original removal notice and after service of a motion to remand as an amendment of the original notice under section 1653). Furthermore, this approach is consistent with 28 U.S.C. § 1446(a), which, borrowing language from the liberal pleading standard of Fed. R. Civ. P. 8(a), was amended in 1988 to require only a "short and plain statement of the grounds for removal." *See* Charles Alan Wright et al., 14C *Federal Practice and Procedure* § 3733, at 351-56 (3d ed. 1998) (describing the amendment of section 1446(a) and stating: "[T]he better rule is that detailed grounds for removal need not be set forth in the notice. Rather, it should be sufficient if the court is provided the facts

ICAROM alleges now, as it did originally, that jurisdiction exists under section 1441(d) because it is an agency or instrumentality of the Republic of Ireland under section 1603.[13] Thus, the district court's determination to allow the

from which removal jurisdiction can be determined. Thus, the same liberal rules employed in testing the sufficiency of a pleading should apply to appraising the sufficiency of a defendant's notice of removal." (footnotes omitted)). Accordingly, although we are mindful that courts construe removal statutes strictly with all doubts resolved in favor of remand, *see Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990), we are satisfied that sections 1446(a) and 1653, together with the Supreme Court's opinion in *Willingham*, permit a court to consider jurisdictional facts contained in later-filed affidavits as amendments to the removal petition where, as here, those facts merely clarify (or correct technical deficiencies in) the allegations already contained in the original notice. To the extent, if any, that cases like *Fuller v. Exxon Corp.*, 131 F. Supp. 2d 1323, 1327 (S.D. Ala. 2001), take a more restrictive view of section 1653, we decline to adopt their reasoning.

13. We also point out that section 1653 need be invoked to permit an amendment only after the expiration of the 30-day period within which an action may be removed under 28 U.S.C. § 1446(b), during which time a removal notice may be amended freely. *See Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 368 (7th Cir. 1993). Under 28 U.S.C. § 1441(d), however, "[w]here removal is based upon this subsection [governing removal by a foreign state], the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown." Because the 30-day time limit on free amendments of the petition is derived from section 1446(b), section 1441(d) would appear to allow a foreign state to amend its removal petition freely during the 30-day time period and for cause at any other time. Furthermore, it appears that an amendment for cause under section 1441(d) likely could be on broader grounds than might be permissible under 28 U.S.C. § 1653 although we do not rely on that possibility here. *See* footnote 11 *supra.* We are satisfied that USX suffered no prejudice as a result of the district court's consideration of the organ prong because ICAROM raised this argument shortly after remand from this court so that USX had ample time to respond to it, and because in part the same facts are relevant under either the ownership or organ prong of section 1603(b)(2) although they could not satisfy the ownership prong here. In this regard we observe that when we asked at oral argument what prejudice that USX suffered by reason of ICAROM's possibly late identification of the organ prong of section 1603 as a basis for foreign state status and thus for district court jurisdiction, USX's attorney was not able to make a specific indication of what it might be. Certainly USX had ample time to develop the facts with respect to ICAROM's organ status.

amendment amplifying the notice of removal clearly was within its sound discretion.[14]

## 2. *Analysis Under the Organ Prong*

The FSIA does not define the term "organ" as used in section 1603(b)(2) and we have not had occasion to consider the meaning or application of that term under the statute. Other courts have developed a flexible approach to determine whether an entity qualifies as an organ of a foreign state under the FSIA and thus is its agency or instrumentality. The Court of Appeals for the Ninth Circuit asks whether the entity " 'engages in a public activity on behalf of the foreign government.' " *EOTT Energy Operating Ltd. P'Ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 997 (9th Cir. 2001) (quoting *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001), *aff'd in part, dismissed in part*, 123 S.Ct. 1655 (2003)). In doing so, that court considers factors including " 'the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law.' " *Id.* (quoting *Patrickson*, 251 F.3d at 807). The court also has stated that "[t]he Act's legislative history suggests that Congress intended the terms 'organ' and 'agency or instrumentality' to be read broadly." *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995). The Court of Appeals for the Fifth Circuit looks to similar factors: " '(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.' " *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213

---

14. Certain insurers contend that USX has waived the waiver issue by not discussing the fact that the district court deemed the notice amended under section 1653 and not arguing that it abused its discretion in doing so. Supp. Br. at 30 & n.8. Inasmuch as USX's brief does discuss section 1653, albeit briefly, USX Br. at 29, it did not waive this issue.

F.3d 841, 846-47 (5th Cir. 2000) (quoting *Supra Med. Corp. v. McGonigle*, 955 F. Supp. 374, 379 (E.D. Pa. 1997)). That court, however, does not apply those factors mechanically and does not require that all five support a determination that an entity is an organ. *Id.* These two courts of appeals appear to be the only ones to have considered directly the factors leading to a conclusion that an entity is an organ of a foreign state.

A primary purpose of the FSIA is to make it difficult for private litigants to bring foreign governments into court, thereby avoiding affronting them. *Patrickson*, 251 F.3d at 806 (citing *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 762, 92 S.Ct. 1808, 1810-11 (1972)). In passing the FSIA, Congress adopted the so-called restrictive theory of sovereign immunity, whereby a foreign state (including its agencies and instrumentalities) is immune from suit for its public or sovereign activities, but not for its commercial or private activities. H.R. Rep. No. 94-1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605. Even when a case involves a foreign state's private activities, however, the FSIA provides the state with particularized procedural treatment in some circumstances, for example, regarding venue, 28 U.S.C. § 1391(f), rule of decision, *id.* § 1606, and execution, *id.* § 1610. Furthermore, as is evident from this case, a foreign state defendant, when named as a third-party defendant may remove the entire case to a district court, even where it is merely one among almost 50 otherwise non-foreign state defendants. The court then must try the case without a jury. 28 U.S.C. § 1441(d).

The FSIA therefore provides for suit in federal court in a potentially broad array of cases, with significant procedural consequences, some of which a plaintiff likely will not welcome. With respect to the jurisdictional provisions of the FSIA, the legislative history states: "Such broad jurisdiction in the Federal courts should be conducive to uniformity in decision, which is desirable since a disparate treatment of cases involving foreign governments may have adverse foreign relations consequences." H.R. Rep. No. 94-1487, at 13, 1976 U.S.C.C.A.N. at 6611. Thus, in considering the scope of the FSIA the point has not been lost on us that the

presence of a foreign state third-party defendant has resulted in the disposition in a district court of a case even though it had been brought in a state court and overwhelmingly involves domestic parties and state law issues and, in the absence of the foreign state party, would have remained in the state court.[15]

In deciding whether to adopt the Court of Appeals for the Ninth Circuit's standard for determining whether an entity constitutes an organ of a foreign state, we therefore should be mindful of the congressional goals of promoting uniformity of decision and avoiding impairing foreign relations because the consequences of the presence of FSIA-predicated jurisdiction are so significant. Surely, a bright-line rule of the sort the Supreme Court adopted with respect to the majority ownership in *Dole* provides for the greatest uniformity of decision. Nevertheless inasmuch as the statute and legislative history are silent as to a definition of the term "organ," and that term inherently is vague and does not have a well-established common law meaning, Congress's inclusion of the term within the definition of "agency or instrumentality" of a foreign state suggests the need for a more flexible approach under the organ prong of section 1603(b)(2) than the Court adopted in *Dole* with respect to the ownership prong of that section.

A flexible approach is particularly appropriate after *Dole*, inasmuch as courts likely now will be asked to evaluate the possible organ status of a wide variety of entities controlled by foreign states through tiering arrangements and because of the widely differing forms of ownership or control foreign states may exert over entities. *See* Joseph W. Hardy, Jr., Note, *Wipe Away the Tiers: Determining Agency or Instrumentality Status Under the Foreign Sovereign Immunities Act*, 31 Ga. L. Rev. 1121, 1161, 1164-66, 1172-73 (1997). Nonetheless, we must be vigilant to protect the goal of uniformity and therefore in determining whether an entity is an organ should consider factors similar, if not identical, to those considered by the Courts of Appeals of the Ninth and Fifth Circuits.

---

15. Of course, the same thing can happen when there is diversity of citizenship even though, as here, the plaintiff initiated the action in a state court.

We agree with the Court of Appeals for the Ninth Circuit that for an entity to be an organ of a foreign state it must engage in a public activity on behalf of the foreign government. Requiring less would open the door to situations in which a party only tangentially related to a foreign state could claim foreign state status and avail itself (and, incidentally, any other defendants in the case) of the FSIA's procedural provisions which, as we have indicated, plaintiffs are not likely to welcome. This result would be unfair to plaintiffs, who in some such cases might not have reason to know of the slight relationship of their dealings with the foreign states, and who, therefore, likely would not have had the opportunity to consider this important fact when negotiating contracts by, for example, negotiating for waiver clauses, or when initiating suit by following the special procedures required by the FSIA.[16] Joseph W. Dellapenna, *Refining the Foreign Sovereign Immunities Act*, 9 Willamette J. Int'l L. & Disp. Resol. 57, 93 (2001). Requiring less would not further the goal of avoiding adverse foreign relations. On the other hand, requiring more would pose potential foreign relations problems.

One district court, taking a narrow view of the term "organ," cited a Supreme Court case interpreting the term "agency or instrumentality" of the Federal government for purposes of the Federal Tort Claims Act to support its conclusion that organ status under the FSIA turns not on "the degree to which an entity is subject to government regulation aimed at assuring compliance with government goals," but on "the 'power of the Federal Government to control the detailed physical performance of the contractor.'" *See Edlow Int'l Co. v. Nuklearna Elektrarna Krsko*, 441 F. Supp. 827, 832 (D.D.C. 1977) (quoting *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976 (1976)). The court therefore concluded that the entity

---

16. Indeed, as this case demonstrates, a party might be dealing with an entity that was not an organ of a foreign state at the time of its dealings. Here USX obtained its insurance coverage for periods before Ireland became involved in ICI and thus it was not dealing with an organ of Ireland at that time. But we are holding that ICAROM was an organ when USX sued it and it removed the case and its status at that time is what matters. *See Dole*, 123 S.Ct. at 1662.

involved in that case, a "worker's organization" founded under the constitution and laws of the Socialist Federal Republic of Yugoslavia ("SFRY"), was not an organ of the SFRY despite the extent to which the state exercised ultimate control over its policies and operations because its "daily operations [were] virtually free of direct government control." *Id.* This narrow a construction of the term "organ" could have potentially adverse effects on foreign relations insofar as foreign states may place significant national value in an entity yet not directly control its daily operations. The Court of Appeals for the Ninth Circuit's definition finds a happy medium whereby an entity that engages in activity serving a national interest and does so on behalf of its national government qualifies for the protections of the FSIA, including a federal forum.

In making this assessment, factors employed by both the Courts of Appeals for the Ninth and Fifth Circuits are relevant, although no one is determinative: (1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; and (6) the entity's obligations and privileges under the foreign state's laws.[17] To this list, we should add an additional factor: (7) the ownership structure of the entity. Under the organ prong, as opposed to the majority ownership prong of section 1603(b)(2), a foreign state might own only 10% of an entity; it might own directly 50% of the entity; or it might own

---

17. It is important to note with respect to the sixth factor that characteristics such as the entity's ability to sue and be sued in its own name, to contract in its own name, and to own property in its own name are not particularly significant with respect to a finding of organ status, given that all entities claiming agency or instrumentality status must, under 28 U.S.C. § 1603(b)(1), be a "separate legal person." Congress intended this term to encompass "a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name." H.R. Rep. 94-1487, at 15, 1976 U.S.C.C.A.N. at 6614.

even 100% of a holding company that owns 100% of the entity. On the other hand it is possible that a foreign state might not own any portion of any entity that nevertheless is its organ as section 1603(b)(2) does not require a foreign state to have any ownership interest in an entity for it to be its organ. Courts should consider how these different ownership structures might influence the degree to which an entity is performing a function "on behalf of the foreign government."[18]

Before applying these factors to this case, we reiterate that USX "does not dispute the District Court's factual findings relating to ICI/Icarom's alleged organ status." USX Supp. Reply Br. at 9. USX contends only that the district court misapplied the relevant legal factors in considering those facts.

### a. *The Circumstances Surrounding ICAROM's Creation*

It is undisputed that ICI was created as a purely commercial, private company in 1935 for the for-profit business purpose of selling insurance policies. USX relies heavily on this fact, and on the fact that since being placed in administration ICAROM has continued as a commercial venture by selling off the Irish Business and by running off liabilities. We believe, however, that USX misunderstands the nature of this factor. First, while this factor certainly would weigh more heavily in favor of organ status where the entity originally was created for a government purpose, *see, e.g., Kelly*, 213 F.3d at 848 (noting that the entity in question was created by government decree to develop and explore the government's mineral resources); *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 654-55 (9th Cir. 1996) (noting that the entity in question was created by Mexican law to refine

_____

18. Given this analysis, it is clear that the factual allegations of ICAROM's notice of removal, which include the assertion that Ireland owns a majority of ICAROM's shares, are relevant to the organ analysis as well as to the majority ownership analysis on which ICAROM originally focused. Even if we did not add "ownership structure" as a seventh factor to consider in the organ analysis the allegation likely would be relevant to the third factor, namely, the degree of supervision by the government.

and distribute property of the Mexican government), it should not be applied so mechanically as to ignore the possibility that a foreign state later may acquire an initially private company and use it for government purposes. Furthermore, that ICAROM's activities may have been predominantly (or entirely) commercial has little bearing on this factor (although it is relevant to the second factor). In any event, a foreign state receives the benefit of the FSIA's procedural provisions in actions arising out of its commercial activities, so that too heavy a focus on the commercial nature of an entity's activities would tend to confuse the question of the level of protection provided by the FSIA (full immunity or not) with the antecedent question we face here, namely, whether the entity comes within the purview of the FSIA at all.

As the district court found, the Irish government indirectly acquired ICI to serve the important national interest of protecting the Irish insurance and banking industries from financial disaster, which in turn helped to maintain stability in the Irish economy. Juris. J.A. at 41-42. The government did not seek any profit-making opportunity, but rather acquired ICI to further this important governmental interest. To advance this purpose, the Minister acted in accordance with special legislation adopted by the Irish Parliament. That legislation further provided that the Minister may hold the shares of SAT as he or she sees fit; SAT's shareholders must hold the shares in trust for the Minister and are bound to pay all dividends or other monies received to the Minister for the benefit of the Exchequer; the Minister may require the shareholders to transfer their shares back to the Minister or to his or her designee; upon the death of a shareholder, the shares automatically vest in the Minister without the need for any transfer of shares; the Minister appoints the directors of SAT after consultation with the Minister of Finance; and the directors hold office on terms and conditions determined by the Minister who may remove them at any time. Moreover, the legislation authorized the Minister to guarantee payment by ICI itself under certain insurance policies.

USX argues that the 1985 Act is irrelevant to ICAROM's status as an organ because the Act authorized the creation

and acquisition of SAT, not ICI, and the organ status of SAT is not at issue here. We do not believe, however, that the Supreme Court's holding in *Dole* requires us to blind ourselves to the true nature of the 1985 Act, thus effectively extending *Dole*'s antitiering holding to the organ prong of section 1603(b)(2). When the Irish Parliament passed the 1985 Act, SAT was a holding company with no purpose other than holding all but six shares of ICI. The shares were held in trust for the Minister, who could hold or dispose of them as he or she saw fit. Thus, although the legislation nominally authorized only the acquisition of SAT, in substance the transaction authorized the acquisition of ICI, albeit indirectly.

In USX's view, ICAROM is attempting to circumvent *Dole* by relying on the 1985 Act under the organ prong. *See* USX Reply Br. at 12. The Court's decision in *Dole*, however, turned on a discrete question of statutory interpretation. The Court noted that the majority ownership prong of section 1603(b)(2) "speaks of ownership," and that the prong's insistence on ownership of "shares" demonstrated "that Congress intended statutory coverage to turn on formal corporate ownership." *Dole*, 123 S.Ct. at 1660. Because, under basic tenets of corporate law, a parent corporation does not "own," *i.e.*, have legal title to, the assets of its subsidiary, a parent company does not own shares of a company held by its subsidiary. *Id.* at 1660-61.

As the Court noted, however, "[c]ontrol and ownership . . . are distinct concepts." *Id.* at 1661. The Court rejected a control test under the majority ownership prong because the statutory language of the majority ownership prong of section 1603(b)(2) makes clear that ownership, not control, is required. *Id.* at 1661-62. On the other hand, the organ prong does not speak of ownership. We find that, although Congress favored ownership over control in the majority ownership prong, its use of the word "organ" suggests an emphasis on control under the organ prong. Thus, although the 1985 Act in terms authorized the acquisition of SAT, not ICI, by that time SAT owned ICI and *Dole* does not prohibit us from examining the substance of the transaction, whereby full control of ICI effectively was transferred to the government, even if legal title to the

shares of ICI was not.[19] Because an act of Parliament authorized the government's assumption of control over ICI and because of the extent of the government's involvement and authority in facilitating the transaction, this factor weighs in favor of a finding of organ status.

### b. *The Purpose of ICAROM's Activities*

As just discussed, the acquisition of ICI served an important governmental interest, namely protecting the Irish insurance and banking industries from financial disaster and maintaining stability in the Irish economy. To be sure, as USX points out, at least since 1990 ICAROM's purpose has been solely to run off claims arising under old policies, as would a private insolvent insurance company engaged in winding down its business. This observation, however, does not take into account the fact that the government played an integral role in the 1990 transaction that has led ICAROM to operate in this way. In 1990, the administrator consulted with and obtained approval from the government, which played an active role in the bidding process, before disposing of the Irish Business and positioning ICAROM to operate as a runoff company. Furthermore, the administrator still consults with the Minister regarding major decisions and gives regular, detailed reports on the status of ICAROM. Thus, although ICAROM is operating solely as a runoff company, it does so only because the government positioned it to do so and only under the supervision of the government, as the district court found. *See* Juris. J.A. at 42, 44. Moreover, in doing this it is carrying out the undertaking of the government when it intervened in the first instance so that a public financial crisis would be avoided. This factor therefore also favors a finding of organ status.

### c. *The Degree of Supervision by the Government*

As suggested by the above discussion, the government has played and continues to play an active role in

---

19. For the same reason, we are able to consider ownership structure as a factor unto itself under the organ prong without running afoul of *Dole* even where that structure involves tiering.

supervising ICAROM's operations though, as the district court found, the government does not control them on a day-to-day basis. *Id.* at 42. Rather, those responsibilities lie with the administrator, subject only to approval of the High Court, as would be the case for any private insurer in administration under the 1983 Act. Nonetheless, the record supports the district court's finding that the government exercises "a substantial level of oversight and control over all major decisionmaking affecting Icarom's ongoing financial affairs." *Id.* at 44. In addition to the reports and consultation already discussed, the government was involved heavily in the 1990 transaction, which positioned ICAROM as a runoff company. ICAROM's current administrator testified that "in all aspects of dealing with the government . . . they are very much the boss." *Id.* at 1456. A representative of the Minister testified that the Minister requires frequent consultation so that he or she may "answer in Parliament as owners of . . . Icarom." *Id.* at 1294. The government's supervision of ICAROM is therefore substantial, and this factor likewise cuts in favor of a finding of organ status.

### d. *The Level of Government Financial Support*

UXS argues that the government has not provided financial support to ICAROM for its funding has come from the ICF. Furthermore, the only cost to the government in supporting ICAROM, according to USX, has been the foregone interest on the 32 million loan from 1992. As the district court found, however, this understanding of the government's financial relationship to ICAROM ignores the fact that the government, despite not directly funding ICAROM, has "arranged and provided financial support" for ICAROM and, in doing so, has subjected itself to substantial risk. Juris. J.A. at 42. USX's observation that the government never has had to make good on its guarantees is beside the point. The government has assured ICAROM's solvency by indirectly lending it money despite the risk of ICAROM not repaying. Furthermore, the government has guaranteed substantial loans made by private lenders to ICAROM.[20] Finally, the government has

---

20. That the government guaranteed that the ICF would have sufficient funds to satisfy any obligations under these loans rather than

lost the use of approximately 32 million in foregone interest, which, as the district court noted, amounts to approximately 9% of the total funding obtained to keep ICAROM operating during the relevant time period. The risk the government assumed in arranging financing for ICAROM and its foregoing interest demonstrate that the government provided significant financial support to ICAROM. This factor therefore also weighs in favor of a finding of organ status.

### e. *ICAROM's Employment Policies*

The government does not require ICAROM to hire public employees, nor does it pay its employees' salaries. Although tending to ICAROM has "consumed a significant amount of [the government's] civil servants' time and effort," as the district court found, this observation is of little relevance, as it says nothing about the status of ICAROM's employees. More relevant is the fact that the government approved both the current administrator before the High Court appointed him and the current general manager before the administrator appointed him. Nonetheless, Irish civil servants do not work for ICAROM. ICAROM pays three full-time employees who participate in the company's private pension plan, not a government plan. The employment policies factor therefore weighs against a finding of organ status.

### f. *Other Obligations and Privileges Under Irish Law*

ICAROM has no special obligations or privileges under Irish law and this factor weighs against a finding of organ status as in some situations an organ would have such obligations or privileges.

### g. *The Ownership Structure of ICAROM*

Although the government does not directly own ICAROM, it indirectly has complete control over ICAROM's shares.

---

guaranteeing the loans directly is a distinction of little difference inasmuch as in either case the government ultimately bears the risk of default.

Six of ICAROM's shares are held in trust for the Minister by civil servants. SAT holds all other shares of ICAROM, and the only two shareholders of SAT are also civil servants who hold those shares in trust for the Minister.[21] It is unsurprising, then, that the Irish government believes, as it apparently always has, that it is the owner of ICAROM. This position has been stated in the Certificate of Ownership, *see* Juris. J.A. at 1230-31 ("[O]n 15 March 1985 the Government of Ireland decided to acquire ICI . . . . This legislation . . . was enacted for the purpose of enabling Ireland to own the shares of ICI through the Minister . . . . [A]s successor to the then Minister for Industry, Trade, Commerce and Tourism, I on behalf of Ireland, acquired ownership of the company now called ICAROM PLC . . . ."), as well as in the testimony of an employee of the Minister, *see id.* at 1294 ("The position of Ireland is that we own Icarom."), and of the current administrator, *see id.* at 1342 ("[T]he Republic of Ireland owns ICAROM through SAT . . . ."), and current general manager of ICAROM, *see id.* at 1327 ("Icarom is owned by the Irish government.").

USX attempts to dismiss the significance of Ireland's indirect ownership of ICAROM by pointing out that the administrator with the approval of the High Court, not the Minister, in most respects runs ICAROM on a day-to-day basis and that the Irish government never has claimed to own PMPA/Primor, the only other insurer to be in administration. This argument is entirely off the mark. ICAROM does not argue that it is an organ because it is in administration (and therefore must report to the government through the High Court), but rather because Ireland owns it for a purpose set forth by the Irish government. Ireland never has owned or controlled PMPA/Primor, either directly or indirectly, nor has it claimed that PMPA/Primor serves any national interest. Because Ireland has complete control over all shares of ICAROM, albeit through a tiered arrangement involving civil

---

21. ICAROM points out that it is not uncommon for the Irish government to provide for statutory ownership of state-owned corporations in this manner.

servants who hold their interests in trust for the Minister, this factor weighs in favor of a finding of organ status.[22]

3. *Conclusion Under the Organ Prong of section 1603(b)(2)*

Five factors therefore favor a finding of organ status, while only two disfavor such a finding. Weighing these factors qualitatively as well as quantitatively, we hold that in these circumstances ICAROM clearly is an organ of the Republic of Ireland for purposes of section 1603(b)(2). This holding is consistent with cases from other jurisdictions interpreting the organ prong of the section.

Significantly, in *EOTT*, in which ICAROM was a party, the Court of Appeals for the Ninth Circuit declined to decide whether it is an organ of Ireland but remanded the case to the district court to do so. The court of appeals, nevertheless, observed that certain characteristics favored a finding that ICAROM was an organ of Ireland, for example, Ireland did not acquire ICAROM for profit-making purposes, the acquisition was accomplished to further the public interest, Ireland placed its economic and political resources behind ICI, the administrator reports to the Minister, SAT is composed entirely of government employees serving at the behest of the Minister, and ICAROM apparently has been operated as a runoff company.[23] 257 F.3d at 998-99. The only factors that the court identified as weighing against a finding of organ status was the status of ICAROM employees, none of whom are public servants, and ICAROM's status under Irish law insofar as ICAROM is subject to suit in Ireland. This second factor should not be considered part of the organ analysis, because an entity *must* be a separate legal person to fall within the FSIA, and Congress intended that the right to sue and be sued be one factor to consider in deciding whether an entity is a

---

22. As discussed above, consideration of this factor is not inconsistent with *Dole*, a case in which the Supreme Court was confronted with a discrete question of statutory interpretation that does not arise under the organ prong of section 1603(b)(2).

23. The court found the final point to be unclear from the record before it, although it has been clarified in the record before us.

separate legal person.[24] Thus, the court of appeals effectively found that the only factor weighing against a finding of organ status is the status of ICAROM employees.[25]

In *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640-41 (9th Cir. 2003), the same court held that the Resolution and Collection Corporation ("RCC"), a Japanese corporation in the business of purchasing, administering, collecting, and disposing of nonperforming loans purchased from failing institutions, was an organ of the Japanese government. The court so held even though RCC's employees were not civil servants, RCC was a private company engaged in a primarily commercial concern, the government authorized 29 other Japanese companies to collect distressed loans, and RCC was not a public corporation, a designation reserved for corporations established by the Japanese government by special law as instruments for activities required by the state. *Id.* The court found that such considerations were outweighed by the fact that the Japanese Diet created the RCC pursuant to legislation for the purpose of carrying out "Japanese national policy related to revitalization of the Japanese financial system." *Id.* RCC also was funded by the government, collected nonperforming loans at the request of the Deposit Insurance Corporation of Japan ("DICJ"), and engaged in certain unspecified activities that were exclusive to RCC and DICJ. *Id.* Although this case may involve less direct government financial support than was present in *EIE*, it also appears to involve more supervision of the entity's activities as well as complete, although indirect, control of the entity's shares. Here, then, as in *EIE*, it is appropriate to conclude that organ status is warranted.

---

24. *See* footnote 17, *supra*.

25. USX argues vigorously that ICAROM should be bound by a letter that it wrote in *EOTT* to the court indicating that it was not an organ of Ireland. We reject that argument as the court of appeals nevertheless later considered the possibility that it was an organ and ICAROM changed its position and argued for organ status. It seems to us that if the court in which the letter was written did not regard it as binding on ICAROM then neither should we. We are told by the briefs that *EOTT* was settled after the remand to the district court so that the district court did not determine ICAROM's organ status in that litigation.

*Kelly* involved Al Furat Petroleum Company ("Al Furat"), which was owned 50% by Syrian Petroleum Company ("SPC") (which was 100% owned by the Syrian government), and otherwise owned by two private companies. 213 F.3d at 847. The Court of Appeals for the Fifth Circuit held that Al Furat was an organ of the Syrian government because a government decree created it for the national purpose of exploring Syria's mineral resources; SPC appointed four of the eight Al Furat board members, generally filling those positions with high-level Syrian government officials; and Al Furat had the exclusive right to explore and develop Syria's identified petroleum reserves. *Id.* at 848. The *Kelly* court, however, did not discuss any other factors. In this case, Ireland acquired ICI to fulfill a national purpose, and although ICAROM has an administrator rather than a board, the current administrator was not appointed until approved by the Minister. Furthermore, Ireland fully controls the shares of ICAROM and has put itself at substantial financial risk in financing ICAROM.

In *Patrickson*, however, the court held that two Israeli chemical companies indirectly owned by the Israeli government were not organs under the FSIA. 251 F.3d at 807-08.[26] The court found that, although Israel created the companies to exploit government-owned Dead Sea resources and although the government had the right to approve the appointment of directors and officers and changes in capital structure, and despite the facts that the companies were obliged to present an annual budget and financial statement to various government ministries and the government could constrain the use of the companies' profits and the salaries of directors and officers, these privileges were "not considerably different from the control a majority shareholder would enjoy under American corporate law." *Id.* at 808. The companies were not run by government appointees, their employees were not civil servants, they were not wholly owned by the government, they could sue and be sued, and they did not exercise any regulatory authority. *Id.* The court therefore affirmed the district court's finding that the companies were

---

26. On the further appeal of the case in *Dole* the Supreme Court did not consider whether the companies were organs of Israel.

"independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives." *Id.*

The companies in *Patrickson* must be distinguished from ICAROM in certain important respects. First, Ireland completely controls the shares of ICAROM. ICAROM's administrator, although approved by the High Court under the 1983 Act, was the candidate supported by the Minister. Most importantly, while the companies in *Patrickson* were created for purposes of exploiting Dead Sea resources for profit, a venture that would have been appropriate for undertaking by a private company, Ireland indirectly acquired ICAROM (which then still was ICI) in furtherance of the important national and inherently public interest of protecting the Irish insurance and banking industries from financial disaster and to maintain stability in the Irish economy. We are not aware of anything in the record to support a conclusion that if the government had not intervened to prevent ICI's financial collapse that any private entity would have done so. In this regard, it is telling that when AIB recognized that ICI faced collapse it turned to the government for help and not to the rest of the banking and insurance industries.

Moreover, the government played an integral part in arranging ICAROM's financing and in positioning ICAROM to continue as a runoff company, rather than as an ongoing concern engaged in the sale of insurance policies for profit. The government did all of this to protect the insurance and banking industries for the benefit of the Irish economy. Thus, while the relevant factors in *Patrickson* favored a finding that the companies were commercial enterprises involved in for-profit activities, the relevant factors suggest in this case that Ireland acquired ICAROM to fulfill a specific national purpose to avoid financial disruption, and that ICAROM therefore engages in a public activity on behalf of the Irish government. The district court thus did not err in finding that ICAROM is an organ of the Republic of Ireland for purposes of section 1603(b)(2) and therefore the case properly was removed under section 1441(b) and the district court was correct in denying the motions to remand.

B.  *THE MERITS*

In considering the merits of this case we exercise plenary review both because this is an appeal from an order for summary judgment, *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 87 (3d Cir. 2000), and because we are concerned with the interpretation of insurance policies. *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999). We have considered the district court's opinion on the motion for summary judgment and are in full agreement with the result the court reached and cannot add significantly to the opinion. Accordingly, we will affirm the order for summary judgment without discussion except to take note of the district court's recognition of our opinion in *Bensalem Township v. International Surplus Lines Insurance Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994), emphasizing the significance of the reasonable expectations of the insured in ascertaining the meaning of an insurance policy. *USX*, 99 F. Supp. 2d at 610. We think it plain that USX could not reasonably have expected when it obtained its insurance policies or at any later time to have the coverage it sought in this case for the consequences of its wrongful activities. While we are aware that USX obtained and paid for broad coverage it should have recognized that there was some limit to it and we regard its substantive contentions, though complex, as not meritorious.

## III.  CONCLUSION

For the foregoing reasons we will affirm the orders of April 1, 1996, March 22, 2000, and September 11, 2002.

A True Copy:
Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*